THE PEOPLE OF THE STATE OF NEW YORK ex rel. THE LEHIGH VALLEY RAILWAY COMPANY, Relator, *v.* LYMAN W. HARRIS and Others, as Assessors of the Town of Ovid, Seneca County, New York, Defendants.

THE PEOPLE OF THE STATE OF NEW YORK ex rel. THE LEHIGH VALLEY RAILWAY COMPANY, Relator, *v.* LYMAN W. HARRIS and Others, as Assessors of the Town of Ovid, Seneca County, New York, Defendants.

THE PEOPLE OF THE STATE OF NEW YORK ex rel. THE LEHIGH VALLEY RAILWAY COMPANY and LEHIGH VALLEY RAILROAD COMPANY, Relators, *v.* LYMAN W. HARRIS and Others, as Assessors of the Town of Ovid, Seneca County, New York, Defendants.

Supreme Court, Seneca County, June 17, 1938.

*William L. Hearne* [*Noble, Leary & Leary* of counsel], for the relators.

*George T. Franklin* [*William S. McGreevy* of counsel], for the defendants.

EDGCOMB (ERNEST I.), Official Referee. Pursuant to an order of reference in each of the above-entitled proceedings, appointing me referee to take evidence in relation to the matters and things put in issue by the return to the writ, and more particularly upon the questions of illegality, overvaluation and inequality of the assessment of relator's real property within the town of Ovid, Seneca county, N. Y., and to report the same to this court, together with my findings of fact and conclusions of law thereon, I beg leave to report as follows:

The Lehigh Valley Railroad connects New York city and the seaboard with Buffalo and the Great Lakes, and runs through the States of New Jersey, Pennsylvania and New York. It has many branches which are either owned or leased by the company. The operating company is The Lehigh Valley Railroad Company, a Pennsylvania corporation. The Lehigh Valley Railway Company owns the roadbed and real property in New York State over which the railroad is operated. The main line of the road, as well as the Ithaca branch, extending from Van Etten Junction to Geneva Junction, traverses the town of Ovid, Seneca county, N. Y.

The center line mileage of the main tracks within the town is 3.495 miles, and of the Ithaca branch 4.252 miles, making a total of 7.747 miles. In 1935 a branch extended from Hayts Corners, on the Ithaca line, to Willard, a distance of 1.448 miles. This made a total of 9.195 miles of road within the town in 1936, and an all-track mileage of 18.310 miles. Business on the Willard branch had fallen off to such an extent that it was decided to abandon this part of the road, and late in the year 1936 that track was taken up, leaving only the small portion extending from the main line into the State hospital grounds, and which was used merely as a siding. Late in 1936 .418 miles of siding on the Ithaca branch was also lifted. So that in 1937 the total center line mileage of the road within the town was 7.747 miles, and the all-track mileage 13.836 miles.

In 1935 the relator was assessed $405,900, exclusive of any special franchise, upon its real property within the town of Ovid. In 1936 its assessment was $407,400, and in 1937 it was $360,800. Claiming that the assessment in each year was erroneous and illegal because of overvaluation, and because it was unequal as compared with the valuation adopted by the board of assessors of the town in assessing property generally within the tax district, relator instituted these proceedings to review and correct the error. They were tried together.

The dispute between the parties centers about the rule adopted in fixing the value of relator's property. The assessors offered no evidence, and do not question that presented by the relator.

It was stipulated that the reconstruction cost of the railroad property within the town, including land and improvements, less physical depreciation, was $453,252 for the years 1935 and 1936, and $429,190 for the year 1937, and that the assessed value of all real property within the town, exclusive of relator's property, was eighty-eight per cent in the years 1935 and 1936, and eighty-four per cent in 1937. The assessors take the position that these amounts form the sole and only basis upon which the value of relator's property must be determined. Relator insists that there are many other items which go to make up value, and that they must all be considered before any accurate estimate of value can be made. That is the question to be decided.

Full value, at which all real property subject to taxation must be assessed (Tax Law, § 8), means actual value, or fair market value. As was said by Mr. Justice BREWER in *Adams Express Co.* v. *Ohio* (166 U. S. 185, at p. 220), " it is a cardinal rule which should never be forgotten that whatever property is worth for the purpose of income and sale it is also worth for purposes of taxation."

" There is not one rule for measuring value for assessments and another for purchase and sale. It is the market value, the ' full value ' that governs and not the mere *ipse dixit* of the assessors." (*People ex rel. Sebring* v. *Dowd*, 131 Misc. 660; modfd. as to costs and affd., 226 App. Div. 849.)

Various items ordinarily enter into the worth of real estate; its condition, the cost of its replacement, the purpose to which it is put, the public demand for such purpose, whether such demand is increasing or diminishing, the cost of its upkeep and management, the income which is derived therefrom, and every other element which can reasonably affect its value. (*McAnarney* v. *Newark Fire Ins. Co.*, 247 N. Y. 176; *Heiman* v. *Bishop*, 272 id. 83; *Hoard* v. *Luther*, 251 App. Div. 692.)

In appraising property, especially that of a railroad or public utility, the appraiser is bound to take into account and give proper weight to the sudden, enormous and progressive declines in value. (*Great Northern Railway Co.* v. *Weeks*, 297 U. S. 135, 149; *People ex rel. Amalgamated Properties, Inc.*, v. *Sutton*, 274 N. Y. 309, 310.)

But the respondents claim that a small segment of a trunk railroad, lying within a limited territory, cannot be valued in the same manner as an ordinary piece of real estate. It might be desirable to have accurate formulae by which such value could be determined, so that there would be a uniformity of assessment in the various tax districts through which the road passes, but that is a matter which should be addressed to the Legislature. As is pointed out in *People ex rel. R., W. & O. R. R. Co.* v. *Hicks* (105 N. Y. 198, at p. 202), the rule which the assessors must follow in fixing the value of a railroad right of way within their jurisdiction makes it inevitable that the same line of road will be differently valued in different towns. While the nature of railroad property is somewhat unique, the same rules, so far as possible, are applicable in determining the value of each. As was said by Mr. Justice KELLOGG, in *People ex rel. N. Y., O. & W. R. Co.* v. *Shaw* (143 App. Div. 811; affd., 202 N. Y. 556), at page 815, " For purposes of taxation the railroad is like any other property belonging to individuals, and its valuation should be determined upon a fair basis in the same manner, and while a railroad company should not escape any burden justly resting upon it as a property owner, it is not in the town for the purpose of having the burden of taxation which should properly fall upon other taxpayers shifted upon it by local authorities."

Respondents rely upon *People ex rel. D., L. & W. R. R. Co.* v. *Clapp* (152 N. Y. 490). That case does not lay down a hard and fast rule that a segment of a railroad's right of way must

always be assessed at its reconstruction cost, less depreciation, no matter what the situation may be. That is evident from a mere reading of the opinion. In speaking of the value of the property to be assessed, the court says (at p. 494): " It may not in every case be worth what it would cost to reproduce it. That would depend upon the income or earning capacity of the road after it is built. * * * It may in any case be competent to consider all the elements of value that they have considered in this case, but in the end, when they come to make their decision as to value, for the purpose of taxation, it may properly be much less, but can never exceed the actual cost of producing the property in the condition in which it is found by the assessors at the time of making the assessment."

In the absence of evidence to the contrary, replacement cost, less depreciation, would undoubtedly be deemed the value of the segment, but that presumption is by no means conclusive; it simply fixes the upper limit beyond which the assessment cannot go — the maximum valuation for a profitable and paying railroad. (*People ex rel. N. Y. C. & H. R. R. R. Co.* v. *Hanking,* 152 App. Div. 488; *People ex rel. N. Y., O. & W. R. Co.* v. *Shaw,* 143 id. 811; affd., 202 N. Y. 556.)

The reason for the rule adopted in the *Clapp* case is obvious. The relator was a prosperous business enterprise, and was paying a fair return upon the investment. It was worth, upon a capitalized earning basis, more than it would cost to replace the roadbed and appliances. The court refused to give its approval to the claim of the assessors that value should be based upon the prorated share of capitalized earnings of the entire road, and held that inasmuch as the road was prosperous and making a fair return on the investment the reconstruction cost of the portion of the road within the town, less depreciation, should set the upper limit of the assessment. Replacement cost is but one of the many elements which the courts recognize as going to make up the value of property. It is very evident that, outside of any incidental loss occasioned by delay in replacement, no property is worth more than it would cost to replace it. It follows that where replacement cost is accepted as one of the measures of the value, it merely fixes the upper limit beyond which the court will not go, but that it does not necessarily determine that the property is worth that figure. Many times it is worth much less.

Respondents emphasize detached portions of the opinion in the *Clapp* case, which, standing alone, seem to lay down the general rule which they contend for. The language in any opinion, how-

ever, must be construed in the light of the facts of that particular case, and if it goes beyond the particular point in controversy, it is not controlling in a subsequent suit where the facts are entirely different. A decision is an authority only for that which it actually decides, and in the *Clapp* case the court was speaking of a prosperous railroad, one which was earning sufficient to keep the road in a good state of repair, and to pay its stockholders a fair income upon their investment.

Here we have a very different situation. The pitiable plight of all railroads of the country at the present time, and during the depression years, is common knowledge. The relator is no exception to the general rule. Its revenues have dropped off to an amazing extent. The income derived from freight carried in 1935 as compared with that carried in 1921 dropped from $62,380,605 to $35,411,494. It increased slightly in 1936 when it went up to $43,276,066. The passenger revenue shows a steady and rapid decrease from 1926, when it amounted to $7,936,047, to 1935, when it was only $2,345,197. A slight rebound in 1936 brought it up to $2,670,937. The gross operating revenue in 1926 was $80,453,150, and fell to $49,156,379 in 1936. After deducting operating charges the balance left for fixed charges and surplus amounted to $4,982,747 in 1935 and $8,700,958 in 1936. The high was in 1926 when this balance amounted to $13,802,605. There was a deficiency in the net income, after payment of fixed charges, for each year from 1931 to 1935, inclusive, ranging from $3,933,042 in 1932 to $1,843,801 in 1935. In 1936 there was a surplus of $1,323,825. The statistics show that the maintenance cost of way and structures as well as that of equipment has been drastically cut during the past five years; revenues have not been put back in the road to the extent that they were in previous years. No dividends have been paid on either the preferred or common stock since 1931. The value of relator's bonds have dropped from $100.92 in 1927 to $78.74 in 1937, and the market value of its stock, as shown from the average weekly high and low of the New York Stock Exchange, shows a decline from $136,471,445 in 1927 to $17,683,666 in 1935. During the current year (1938) the market value of the common stock fell to six per cent of its par value. Tables showing property investment, income account, rate of return, freight and passenger operation, and revenue statistics, maintenance and transportation expenses, and distribution of operating revenues, from 1921 to 1936 give a fair picture of the constantly decreasing income and increasing outgo of the relator. The period covered by these figures is sufficient to warrant the conclusion that no immediate or steady improvement is in sight.

During the depression an attempt has been made to cut expenses wherever possible to meet declining income. A railroad cannot discontinue unprofitable service at will; the Interstate Commerce Commission and the Public Service Commission have something to say on that subject.

No intelligent valuation of property constructed and used for commercial purposes, and as an investment — and that is the only reason for building or operating a railroad — can properly be arrived at without considering the income derived from the property. A property which is properly managed, and which fails to pay its fixed charges, or to return a fair income to its owners, and which shows no likelihood of so doing in the future, is hardly worth replacing, and in such a case reconstruction cost alone would be an unfair basis of value. I do not mean to be understood as holding that the value of commercial property is to be determined solely by capitalizing the income derived therefrom upon the basis of a fair return, but I do say that such capitalized income is an important item to be considered, along with the reconstruction cost of the property, and the various other items which bear on its value.

The Empire State Building is a valuable property, not only because of the large sum of money expended in its construction, but on account of its location in the business center of New York city, where the demand for stores and offices is great. In arriving at its value for assessment purposes its reconstruction cost would be an important item in determining that amount. But would any one be so bold as to suggest that, if the building were to be taken out of its environment, and placed in the center of the Adirondack Mountains, remote from business activity, and where few, if any, tenants could be found to occupy the offices and stores, and the revenue to be derived from rentals would be practically nothing, the reconstruction cost would be decisive of the value of the building? Would a railroad three hundred miles long, connecting two important industrial centers, and running through a prosperous and thickly inhabited country, be as valuable as one of the same length built in the wilds where but few people resided, and where there was no industrial or business activity? Yet the reconstruction cost of the two roads would be substantially the same. To ask these questions is but to answer them. Where property is not a paying investment — and property employed in transportation service is entitled to a fair return (Transportation Act, 1920; *Texas & Pacific Ry. Co.* v. *Gulf, Colorado & Santa Fe R. Co.*, 270 U. S. 266, 277) — the value does not necessarily depend upon replacement cost. Investors are not looking for property

that yields little or no return. The rule to be applied in the case of a paying road can have no application in times of abnormal depression, when business is at a standstill, and revenues are insufficient to meet operating expenses and fixed charges. A reasonably prudent person could not be found who would purchase the property or undertake its reconstruction at reproduction prices, or at any price whatsoever. At least there is a total absence of any such proof, and the suggestion that such a person exists has not been made.

Judge ADAMS, speaking for the court in *People ex rel. Powers* v. *Kalbfleisch* (25 App. Div. 432; appeal dismissed, 156 N. Y. 678), said (at p. 436): "We are inclined to think that the net income of a building constructed for commercial purposes and as an investment is an important element in determining its assessable value. For, as was said in an analogous case, ' a thing to be worth its cost must be able to pay out of the profits from its use and enjoyment an income bearing some relation to the interest due from an investment or loan of a sum of money equal to such cost and over and above the loss by wear or waste.' (*People ex rel. Ogdensburgh & L. C. R. R. Co.* v. *Pond*, 13 Abb. N. C. 1.) "

The courts in this State have repeatedly held that in valuing railroad property for assessment purposes, even though it be but a part of the entire system, it was proper to take into account the earnings of the company and its earning capacity. (*People ex rel. Panama R. R. Co.* v. *Comrs.* of *Taxes*, 104 N. Y. 240; *People ex rel. R., W. & O. R. R. Co.* v. *Hicks*, 105 id. 198; *People ex rel. D., L. & W. R. R. Co.* v. *Reid*, 64 Hun, 553; *People ex rel. Wallkill Valley R. R. Co.* v. *Keator*, 36 id. 592; *People ex rel. Buffalo & State Line R. R. Co.* v. *Barker*, 48 N. Y. 70; *People ex rel. N. Y. C. R. R. Co.* v. *Thompson*, 156 Misc. 536.)

If we were to adopt respondents' theory and ignore all elements going to make up the value of real property, except its replacement cost, the sum total of the value of all the various segments going to make up the system would equal the reconstruction cost of the line taken as a whole. But, if one were to value the system in its entirety, he would at once inquire as to its earning capacity, and if the road was on the verge of bankruptcy that fact would have a powerful influence on the valuation. That being so, we would be confronted with a situation where the assessment of the combined parts of the system would exceed the whole, which shows the fallacy of blindly following the rule contended for by the respondents.

I have, therefore, reached the conclusion that the *Clapp* case is not controlling here, and that, in assessing the part of relator's road

lying within the town of Ovid, the assessors should have taken into consideration and given due weight to the various other items going to make up value, and especially the earning capacity of the relator, and the income derived from the system as a whole. That they did not do so is quite apparent. The assessors were not sworn, and have not chosen to reveal the basis of their appraisal. They fail to specify the exact basis of their valuation in either their original or amended return, except that they say they had before them an appraisal of the reproduction cost, less depreciation, of the property, made for them by the New York State Tax Commission. The similarity between such figures and the assessment for the various years would warrant the inference that this appraisal was, in reality, the only basis of the assessment. If they took into consideration any other element, outside of their general knowledge of real estate values, in fixing the value of relator's property, they failed to so state. In its protest of its assessment the relator called attention to its rapidly diminishing income, and to the fact that the net earnings of its system did not warrant any such assessment as was made by the respondents, but the assessors turned a deaf ear to such protest, and there is no evidence that they gave any consideration to the constantly diminishing income of the road in arriving at their value.

I have reached the conclusion, therefore, that relator's assessment is excessive and erroneous; that the earnings of the road would not warrant any such valuation; that no one, in the light of the present economic conditions, would be willing to replace the road, or any part thereof, at its reproduction cost or anywhere near that figure.

I realize that the assessors are public officials, and that a public officer is presumed to perform his duty, and that the burden rests upon the relator to show that its assessment is erroneous. The correctness of an assessment, however, is presumptive only; it is by no means conclusive. The amount of evidence necessary to overcome the presumption may be much or little. Here I think that it is overwhelming. Respondents do not dispute the bankrupt condition of the road. The assessors have shut their eyes to an important element of value, and have blindly followed one basis. This was error.

The assessment must be reduced. The troublesome question is how much. I know of no formulae by which the amount of this assessment can be determined to a certainty. In the final result value is but the judgment of the appraiser. I have attempted not to substitute my judgment for that of the duly elected assessors of the town. After giving what I think is proper and due consideration to all the various elements which go to make up the value of

relator's roadbed and property within the town of Ovid, its physical condition, age, location, reconstruction cost, depreciation, the conditions in the locality served by the road, its earning capacity, the income which has been received from the road in the past years, the steady falling off of business, both freight and passenger, the decline in revenue, the increased cost of operation, the sudden, enormous and increasing slump in the value of its securities, and in the value of all railroads as well as other classes of property, the collapse of values generally due to the depression which commenced in 1929, and all other items going to make up the value of the real property in question, I have reached the conclusion that the full and fair value of relator's property in 1935 and 1936 was $300,000, and that the assessment for those years should be reduced to eighty-eight per cent of that amount, or $264,000.

The assessment for 1937 was reduced to $360,800. We are not told the reason for this reduction. A part of the tracks had been taken up, and the track mileage had been reduced from 18.310 miles to 13.836 miles. We may well assume that the reduction in assessment was due to the reduction of property which could properly be assessed. It does not appear that the assessors considered relator's dwindling income in 1937, or that the reduction in the assessment was due to any such cause. If we are to give proper weight to income, we must not forget that in 1936 the deficit in net income in the five previous years, ranging from $1,843,801 to $3,933,042, was changed to a profit of $1,323,825. This latter sum was available for dividends, and represented earnings equal to $1.09 on each share of common stock. Under these circumstances it would hardly seem fair to reduce the 1937 assessment by the reproduction cost of the portion of the track which had been removed in the fall of 1936. Taking the increased earnings for 1936 into consideration, as well as the value of the amount of track which had been lifted, and all other items bearing on the question of value, I find that the full value of relator's real property liable to taxation within the town of Ovid in 1937 was $250,000, and that the assessment for that year should be reduced to eighty-four per cent of that amount, or to the sum of $210,000.

I present herewith my findings of fact and conclusions of law, together with the exhibits and the evidence taken before me, as directed by the order of reference.

All of which is respectfully submitted.

---

Opinion and findings of fact and conclusions of law of referee were confirmed and adopted by Mr. Justice WHEELER, sitting in Special Term in the city of Rochester on June 30, 1938.