The People of the State of New York ex rel. NEW YORK, ONTARIO AND WESTERN RAILWAY COMPANY, Respondent, against SAM ROSENSHEIN et al., as Assessors of the Town of Fallsburgh, Sullivan County, et al., Appellants. (Assessments for 1936, 1937, 1938, 1939, 1940, 1941, 1942.)

Third Department, November 10, 1948.

*Lazarus I. Levine* for appellants.

*Watts, Oakes, VanderVoort & Bright* for respondent.

DEYO, J. Appeals by the defendants from the final orders entered in Sullivan County on the 15th day of February, 1947, in seven certiorari proceedings covering the assessment years of 1936 to 1942, both inclusive. No objection is taken to that part of said orders which approved, confirmed and adopted the findings and decision of the referee as to the cost new less physical depreciation of the relator's property or as to the value of the relator's land within the town of Fallsburgh used in its railroad operations. The objection arises over the adoption and use of an economic depreciation rate which was applied to the value of the relator's property as found and which resulted in a drastic reduction in the assessments for each year.

It was established by the evidence and found by the referee that during the years in question the relator's operating income had declined from some $8,500,000 to a low in 1940 of $5,500,000, increasing in 1942 to $7,500,000. During this period its net revenue was insufficient to meet its tax accruals and fixed charges. Since 1937, the railroad has been in the hands of a trustee appointed and acting under the direction of the United States District Court. The relator has been in default on its bonds since 1937, and has paid no dividends since 1926. The evidence sustains the referee's findings that the basic causes of the relator's financial distress during these years were the permanent loss of much of its coal, milk and passenger traffic, the lack of substituted forms of traffic and increased costs of operation. Its coal freight revenue dropped from some $5,000,-000 to approximately $1,500,000. Its milk revenue declined from $1,000,000 in 1932 to $316,000. Its passenger revenue declined from $1,000,000 in 1931 to $265,000 in 1940. Only its merchandise freight revenue showed any improvement whatsoever and that entirely insufficient to make up the losses in other lines. Despite

this dismal and discouraging picture the assessors for the town of Fallsburgh continued to assess relator's twenty-five to thirty miles of trackage solely on the basis of reconstruction cost less physical depreciation plus land value. Following this principle it appears that although the relator owned less than 2% of the total area of the township, it was called upon to shoulder better than 10% of the town's tax burden. The referee held, and properly so, that such a basis for the assessment of a bankrupt railroad was untenable. Although reproduction cost less physical depreciation plus land value is the generally accepted method of determining the amount of the assessment of commercial property, the result thus obtained sets the maximum value which may be placed upon property of this type for tax purposes. (*People ex rel. Manhattan Square Beresford, Inc.*, v. *Sexton*, 284 N. Y. 145.) Such a rule of valuation is utilized as the sole test only in the case of a paying property. (*People ex rel. Delaware, Lackawanna & Western R. R. Co.* v. *Clapp*, 152 N. Y. 490, 494.) If the property, in the instant case a railroad, is not a paying one and is not producing sufficient income to meet its obligations, replacement cost is no longer the real measure of its value. (*People ex rel. New York, Ontario & Western Ry. Co.* v. *Shaw*, 143 App. Div. 811, affd. 202 N. Y. 556.)

On the other hand, the referee properly declined to adopt the contention of the relator that the road had only scrap or salvage value, since it was not in liquidation and was in fact in operation during the years in question. Since under the circumstances, neither reproduction cost nor salvage value constituted a proper yardstick, the referee turned to earnings as a criterion. In this he was entirely justified. (*People ex rel. Lehigh Valley Ry. Co.* v. *Harris*, 168 Misc. 685, affd. 257 App. Div. 912, affd. 281 N. Y. 786; *People ex rel. New York Central R. R. Co.* v. *Griffin*, 174 Misc. 28; *People ex rel. New York Central R. R. Co.* v. *Thompson*, 156 Misc. 536.) The defendants' principal objection on this score is that the referee considered actual earnings rather than earning capacity. Such objection might well be taken if there was any proof that the terms were not synonymous as applied to the instant case. The record is barren of any such proof. True, the defendants argue that had certain other policies been adopted the road would have experienced larger revenues and smaller losses. Such criticism of the management of the road is based on hindsight rather than foresight and at best, suggests a course of managerial conduct, the success and advisability of which is purely problematical. There is no proof whatsoever that the incidents complained of consti-

tuted mismanagement, or that any different course of conduct other than that employed would have been feasible or practical or would have produced any different results than those actually obtained. The thought inherent in the defendants' suggestions is that the referee should have substituted his judgment as to how the road should have been managed for that of the corporation and the trustee. Such an argument is fallacious, and the referee's refusal to consider alleged incidents of mismanagement as factors bearing on the reduced earnings which the road experienced, was entirely proper, since there was no proof that such incidents constituted mismanagement or that any of the changes of policy suggested would have been feasible, expedient or productive.

An examination of the relator's financial condition indicates, and the referee found, that in 1935, which was the last year when the road was able to meet its obligations, its net operating revenue was $2,220,000. This was approximately the amount necessary to meet its tax accruals and fixed charges. In 1936, the net revenue was $2,122,091, in 1937, $680,859, in 1938, $465,499, in 1939, $494,632, in 1940, $169,567, in 1941, $658,811, and in 1942, $1,029,292. The recurring annual deficits thereby resulting year after year are clearly indicative of a condition permanent rather than temporary in nature, which must be considered in arriving at the fair value of the relator's property. The referee attempted to express the economic depreciation which the road had suffered by reason of its loss of earnings by means of a mathematical formula. He did this by averaging the net income for the seven years involved, which he found to be approximately $800,000. Since a net income of approximately $2,220,000 was necessary to meet tax accruals and fixed charges, he reasoned that the fraction 8/22 represented the economic depreciation rate to be applied to reconstruction cost less physical depreciation plus land value to arrive at the actual worth of the property. There is nothing in the law which precludes the use of a formula based on earnings as an aid in the determination of the ultimate question of value. The theory behind the formula used herein is sound. An acre of land which yields but ten bushels of wheat is worth only one half as much as one which yields twenty bushels. A railroad is constructed to produce revenue and to yield profit upon the investment. If that revenue declines then its value likewise declines by substantially the same ratio.

Although, under the circumstances of this case, we are in accord with the theory adopted, we feel that the referee erred in its application in two particulars. The first is purely a

mathematical error. The fraction 8/22, representing the economic depreciation rate is not 27½% as found, but is 36.3%. Therefore, the findings of value made are not correct, even though the formula utilized by the referee be adopted. Furthermore, the adoption of an average net income for the years in question was not justified. The assessment for each of the years involved is a separate and distinct assessment and must be treated as such. The assessors and the referee were required to assess the property for each particular year on the basis of its then value. The economic depreciation rate for any given year depends upon its financial condition in that year and may not be governed by what its condition was in some subsequent or prior year.

Modifying the formula utilized by the referee in arriving at an economic depreciation rate to be applied to reproduction cost less physical depreciation plus land value, as found, results as follows: In the year 1936, the net revenue was $2,122,091. The economic depreciation rate was therefore 21/22, or approximately 95% of the cost new less physical depreciation plus land value, found by the referee to be $1,413,937.68. The full value of the relator's property was therefore $1,343,240.80, which sum equalized at 9% is $120,891.67, plus $3,520, the equalized value of the Brown's Pond property, producing a full equalized value of $124,411.67 for that year, to which amount the assessment must be reduced.

In the years 1937, 1938, 1939 and 1940, the proper economic depreciation rates to be applied are 68/222 or 31%, 465/2220 or 21%, 494/2220 or 22% and 169/2220 or 8%, respectively, each of which produces a full equalized value less than the assessed values claimed by the relator in its protest filed with the assessors, below which amount neither the referee nor the court may go. The total assessments for those years, as fixed by the referee at $50,000, $45,000, $415,000 and $450,000, respectively, are affirmed.

In 1941, the net revenue was $658,811, resulting in an economic depreciation rate of 658/2220, or approximately 30% of the cost new less physical depreciation plus land value found by the referee to be $1,211,593.46. The full value of the relator's property was therefore $363,478.04, which equalized at 90% produces a full equalized value of $327,130.23, the amount to which the assessment must be reduced.

In 1942, the net revenue was $1,029,292, resulting in an economic depreciation rate of 10/22, or approximately 45% of the cost new less physical depreciation plus land value found by the referee to be $1,215,783.81. The full value of the relator's

property was therefore $547,102.71, which equalized at 90% produces a full equalized value of $492,392.44, the amount to which the assessment must be reduced.

We appreciate full well that no mathematical formula for arriving at value can be 100% accurate. The economic depreciation rates herein employed constitute no exception to that rule. We also appreciate that the net operating revenues held to be required to meet fixed charges and tax accruals are only estimates. The same would be likewise true of any of the commonly accepted indices of value. The assessment of property is not an exact science, and by its very nature never can be. The best that can be hoped for is that the method employed, whatever it may be, will constitute a factual approach to the problem. The adoption of the formula herein utilized, based as it is on the actual experience of the road, affords a reasonably satisfactory yardstick with which to measure value in this particular case.

The orders appealed from and the findings and decision of the referee should be modified in accordance with this opinion, and as modified affirmed, fixing the assessments of relator's property in the town of Fallsburgh for the years in question as follows:

| 1936 | $124,411.67 |
| 1937 | 50,000.00 |
| 1938 | 45,000.00 |
| 1939 | 415,000.00 |
| 1940 | 450,000.00 |
| 1941 | 327,130.23 |
| 1942 | 492,392.44 |

HILL, P. J., BREWSTER, FOSTER and RUSSELL, JJ., concur.

Orders appealed from and findings and decision of the referee are modified, on the law and facts, in accordance with this opinion, and as so modified are affirmed, with one bill of costs to the relator-respondent, fixing the assessments of relator's property in the town of Fallsburgh for the years in question as follows:

| 1936 | $124,411.67 |
| 1937 | 50,000.00 |
| 1938 | 45,000.00 |
| 1939 | 415,000.00 |
| 1940 | 450,000.00 |
| 1941 | 327,130.23 |
| 1942 | 492,392.44 |

The form of the decision to be settled before Mr. Justice DEYO on five days' notice.