THE PEOPLE OF THE STATE OF NEW YORK ex rel. FREDERIC E. LYFORD, as Trustee of the Property of New York, Ontario and Western Railway Company, Respondent, against JAMES C. ALLEN et al., as Assessors of the Town of Fallsburgh, County of Sullivan, Appellants.

Third Department, November 16, 1955.

*Lazarus I. Levine* for appellants.

*Elbert N. Oakes* for respondent.

BERGAN, J. This proceeding reviews tax assessments in the town of Fallsburgh on real property of the New York, Ontario and Western Railway Company in seven successive years, 1944 to 1950–51. The assessments ranged from $1,300,960 in the first of these tax years to $380,230 in the last.

During all this time and for several years earlier, the railroad has been in reorganization under section 77 of the Bankruptcy Act (U. S. Code, tit. 11, § 77) and it has been managed by trustees. The Referee who heard the case found the value of the railroad property in the town in 1944, 1945, and 1946 to have been $94,000; and in 1947 to 1950 to have been $75,000; and the Special Term has directed reductions accordingly, giving due weight to an equalization rate of 90%.

The trustee of the railway objects to the application now of a judicial formula adopted in earlier proceedings covering the years 1936 to 1942 (*People ex rel. New York, O. & W. Ry.* v. *Rosenshein,* 274 App. Div. 396, revd. 300 N. Y. 74), because he contends that the formula used, employing net revenue measured against certain offsets in order to find the value of the property, did not take into consideration all the material data, and weighed unfairly against the taxpayer. The town, which then objected to the formula, now embraces it, since it would reach a rather close approximation of some of the assessments here reviewed.

The parties stipulated that the value of the land alone in each year was $100,000. There are 13.10 miles of right of way. The land consists of 185.48 acres. The stipulation as to the value of the land is accompanied by a stipulation that the reproduction value of the improvements less depreciation is $900,000. The value of a railroad improvement to land depends in large measure on the success of the railroad enterprise and the large record before us abundantly demonstrates the hopeless economic situation of the railroad as such.

Assessing officers are not required to conform their assessments rigidly to an unprofitable use of real estate by a taxpayer. Their function is concerned with real property primarily. They are required by law to assess land at its full value; and then to assess the improvements on land by the same standard. In the nature of things they cannot underwrite by tax remission the earnings of the real estate they assess. That the use made of the improvements is unprofitable is not to say that no tax, fairly proportionate to the rest of the tax district, shall be levied on them; or that they necessarily have no value.

There is no opinion evidence in the record before us on the market value of the land owned by the railroad in the town; or of the improvements. These may have other possible utilizations and hence a value apart from their worth as railroad property. As to the land we are left with the stipulation as the main basis of value we can uncover in the record; but as to the improvements, the stipulated reproduction cost less depreciation for railroad purposes lacks the relevancy of realism applied to a railroad *in extremis.*

The basic New York rule for arriving at the " full value " (Tax Law, § 8) for the assessment of railroad real property by local assessors was established in *People ex rel. Delaware, L. & W. R. R. Co.* v. *Clapp* (152 N. Y. 490 [1897]). It was there laid down that since other factors, including the use of personal property, enter into railroad earnings, the amount of earnings capitalized would not be a just basis of value for real estate taxation; and that the " just and reasonable rule of valuation " was reproduction cost (p. 494).

Experience demonstrated, however, that where a railroad was losing money, the mechanical application of reproduction cost might itself be unjust; and it was the dictum of this court in 1911, that where the railroad operation is not profitable the " fair value of its property " may be less than the reproduction cost. (*People ex rel. New York, O. & W. Ry. Co.* v. *Shaw,* 143 App. Div. 811, affd. 202 N. Y. 556). Judge KELLOGG was there of opinion that the rule of the *Lackawanna* case provided merely a " maximum valuation " for " the best and most profitable railroad " (p. 813).

The court in the Second Department in 1912, was of opinion that the *Lackawanna* rule of reproduction cost was " presumptive rather than conclusive " and that value might be found on a different basis, for example, in a case where the improvement of the land was disproportionate to its proper use for railroad purposes; but the point was not there actually

decided (*People ex rel. New York Central & H. R. R. R. Co.* v. *Hanking,* 152 App. Div. 488, 491).

A decision in which reproduction cost was disregarded because of the adverse economic situation of the railroad, and thus in which the point was actually decided, is *People ex rel. Lehigh Val. Ry. Co.* v. *Harris* (168 Misc. 685, affd. 257 App. Div. 912, affd. 281 N. Y. 786). Judge EDGCOMB, then an Official Referee, reached a conclusion, grounded on a carefully reasoned opinion, which penetrated below a stipulated reconstruction cost including land and improvements for each of two of the years under review of $453,252 to find a full value of $300,000; and for another year of $429,190 to find a full value of $250,000. He found (p. 690) the railroad had suffered the " pitiable plight " of losses commonly observed in that period (1935–37) and that its revenues had dropped off " to an amazing extent ".

When the earlier proceedings brought by the present relator were before this court for review (274 App. Div. 396) it was held on the authority of the language used in *People ex rel. New York, O. & W. Ry. Co.* v. *Shaw* (*supra*) that since the railroad operation was not profitable, replacement cost " is no longer the real measure of its value " on one hand; and that " since it was not in liquidation and was in fact in operation " during the years under review, salvage worth was not a fair measure of its value. (Opinion, DEYO, J., p. 399).

In that situation the court was of opinion that the Referee was justified in finding earnings " as a criterion " (p. 399). On this branch of the case the Court of Appeals noted that the net operating income could properly be taken into account in reviewing the assessments, and that the factor used in considering the annual average deficit was " not arbitrary " (300 N. Y. 74, 78).

The record before us abundantly demonstrates that since the years then under review, the financial situation of the railroad has steadily deteriorated and as a railroad entity it is at the point of extinction. The moribund condition of the enterprise is suggested by the fact that since a plan of reorganization was submitted to the Interstate Commerce Commission in 1940, there has been a deficit in every year except two (1941, 1942) and in these, retroactive wage increases would have caused a deficit upon proper allocation. As of May 11, 1951, the trustee owed $7,500,000 of which $3,752,266 was for taxes.

The losses have been continual and are consistently mounting. The formula applied in the earlier proceedings which contemplated the railroad as a going concern with some hope of recovery

is not fairly to be applied to the years now under review; and the Referee who heard the case and the Special Term, we think, properly refused to apply it.

But when one swings away from the apparent safety of a mathematical formula, or the measure of certainty afforded by estimates of " reproduction costs ", and the floor below these estimates is penetrated to reach lower levels of value by the judicial application of general and largely subjective criteria, the question is the point at which decision is to come to rest.

Judge EDGCOMB poignantly recognized the nature of this problem in the *Lehigh Valley* case (168 Misc. 685, 693, 694, *supra*). " The assessment must be reduced ", he said. " The troublesome question is how much. I know of no formulae by which the amount of this assessment can be determined to a certainty." He thereupon grouped together in broad language a number of general factors, the recital of which he terminated by saying that he had " reached the conclusion " that the assessments be reduced to the round figures that appear in his opinion.

The process of grouping broad factors together followed by the Referee in the case before us was very much like that; but the result here was not merely that the stipulated reconstruction cost less depreciation was penetrated; but that it was entirely obliterated; and the total assessments, as thus reduced, were fixed lower than the stipulated value of the land alone.

The value of the land was stipulated, as it has been seen, at $100,000 for each of the years; the value of land and improvements together was found by the Referee to have been $94,000 for three of the years and only $75,000 for four of the years.

Since the assessors are required to assess land at full value (Tax Law, § 8) it would be difficult to conceive of a situation where an owner could make so unprofitable a use of his land in a tax district that a partially negative assessment on the land would be justified by which the land and improvements could be assessed for less than the value of the land alone. But the theory of the order under review seems to be that it is possible to lose enough in a business enterprise that the deficit is to be utilized to reduce for tax purposes the actual value of the property so that public authority is to assume a measure of the loss in a lower tax revenue.

Certainly no case has ever gone as far as that. Losses have been reflected in the depreciated reproduction cost of property dedicated to the enterprise for tax purposes; but if the enterprise reaches the irreducible minimum as an enterprise and is abandoned, its property is sold for its fair value on the open

market. The assessors are required by law to ascertain that value and make their assessments accordingly. Even if a railroad is defunct as an entity, the value of its real estate apart from utilization for railroad purposes is not only assessable but it must be assessed " at the full value thereof ".

While there is no proof of actual value of land or improvements as such, other than the stipulations, the railroad has offered for the aid of the court extensive photographs in series of the entire property as having an " entirely competent " bearing on the broad " subject matter of value ". We note that in the stretches of right of way in the open country, the land would have only the value of a strip for some special use, and in some parts only the acreage value of the surrounding terrain.

But there are some areas shown where the railroad land occupies approaches and waiting areas, as well as rights of way, in central locations in the village business centers and areas touching upon highways; and we assume from this as well as from the stipulation, that it has an open market value of at least the $100,000 that has been agreed upon.

As part of relator's case there was offered in evidence at the trial proof of other assessments of the railroad by adjacent towns in the County of Sullivan. In the town of Liberty there were 27.06 miles of right of way in 1944–45; 22.21 in 1946; and 13.53 from 1947 through 1950. The assessments for these years were: 1944 through 1948, $130,681; 1949, $96,590; 1950, $48,295. In the town of Mamakating there were 41.69 miles of right of way in 1944–45 and 28.41 miles in 1946 through 1950. The assessments for these years were: 1944 through 1947, $180,488; 1948, $179,277; 1949, $135,111; and 1950, $81,066.

In neither town are we advised of the fair value of the land or its relative location; nor are we advised what the structures and improvements on it are. But since the County of Sullivan is required by statute (Tax Law, § 82) to reimburse each town for its unpaid taxes, and since it is conceded the railroad has not only not paid taxes to the Town of Fallsburgh, but not paid them to any other town in the county, we feel required to give some consideration to the resulting equities between the Town of Fallsburgh and the county generally in the ultimate adjustment for the taxes to result from this decision.

With the assessments hereby greatly reduced, the Town of Fallsburgh will be required to make substantial repayments to the county for the amount of taxes already advanced to the town by the county at the higher assessments; but the other

side of the coin is that if one town's assessment is much too high and the other's much too low; and the railroad pays neither, the general taxpayer of the county in underwriting the town taxes pays a much greater percentage to the town with the high assessment than to the town with the low one.

We cannot, of course, in an assessment review case correct all the inequalities which may result from different conceptions of value of railroad property taken by assessors in different towns; since such local judgments of assessing officers in the absence of definite proof of error is presumed to be correct. Reasonable minds might fairly differ about the amount at which the railroad property should be assessed; but consideration should also be given to the practical effects of such differences.

In our approach to the evaluation of the improvements we feel required to keep the equities of the adjoining towns in mind. We feel bound as to the value of the railroad's land by the stipulation of both sides that it had a value of $100,000. Since there is no proof of the salvage or usable value of the railroad structures and other improvements on the land and the only proof on that subject is either reconstruction cost or economic values reflected in the operation of the railroad which we deem for the reasons stated to have no real relevancy now, we are left without a substantial basis in the record to fix the salvage or usable value of the structures. This issue was not tried or presented by the parties or briefed here.

The photographs offered by relator in aid of value certainly reflect some value for the improvements. There can be little doubt that track, ties, wires and poles have a salvage worth. At least two substantial station structures in central business areas are shown, as well as a freight house and other buildings. If relator would stipulate this value at $50,000 in addition to the already stipulated $100,000 for the land, we would affirm the order as modified to reflect these additions. We would think this might strike as fair a result as we can bring about among the several towns, in view of the differences of opinion among the local assessors. We are not fully able to redress those differences.

Upon filing with the clerk of this court a stipulation by the relator within thirty days of the date of this decision that the order be modified to provide a valuation of $150,000 in each of the years under review, and to reflect in the assessments the stipulated rate of equalization, the order should be modified accordingly and as thus modified affirmed; in the absence of such stipulation the order should be reversed and a new trial ordered.

Foster, P. J., Coon, Halpern and Zeller, JJ., concur.

Upon filing with the clerk of this court a stipulation by the relator within thirty days of the date of this decision that the order be modified to provide a valuation of $150,000 in each of the years under review, and to reflect in the assessments the stipulated rate of equalization, the order is modified accordingly and, as thus modified, affirmed, without costs; in the absence of such stipulation the order is reversed and a new trial ordered.