John 0. Wheeler, Off. Ref.
The petitioner, the Delaware, Lackawanna & Western Railroad Company, has instituted these 11 proceedings under former article 13 of the Tax Law for review of its assessments in the Towns of Erwin, Campbell, Avoca and Way land in Steuben County and the Town of Sparta in Livingston County for the years 1958 and 1959 and the City of Corning for the year 1959.
Although the proceedings were referred in 1958 and 1959 there has been delay pending appeals to the Appellate Division and later to the Court of Appeals from orders denying respondents’ motions for dismissal of all the proceedings; consequently, respondents’ brief was not submitted until July 20, 1961.
In each of the proceedings the parties have entered into stipulations which substantially narrow the issues presented. They have stipulated “for the purposes of this proceeding” the percentage of full value as found by the Assessors at which all real property in each of the municipalities was assessed in the years 1958 and 1959. It was also stipulated that petitioner’s allegations of overvaluation and inequality “ are based solely upon Petitioner’s claim that the Respondents in making said assessments and valuations did not give any, or sufficient, consideration to the depreciation of the value of Petitioner’s real property in said towns by reason of diminution of Petitioner’s income and earning capacity ’ ’.
Otherwise stated, the petitioner has admitted, for the purpose of these proceedings, that the Assessors correctly considered cost of reproduction less depreciation, and all other proper elements of value in arriving at the full value of the properties except the element of economic depreciation or diminution in value. However, and in view of the fact that petitioner failed to offer other proof of full market value of the properties, respondents argue that each proceeding should be dismissed. Petitioner, on the contrary, insists that when respondents chose to stipulate ‘ ‘ for the purposes of this proceeding ’ ’ that all real property in each municipality was assessed at a certain percentage of full value as found by the respondents, this eliminated any necessity to prove by other methods the full value of petitioner’s property.
I find no ambiguity in the stipulations which were undoubtedly entered into knowingly and intelligently for the obvious purpose of saving protracted hearings and consequent expense to all the parties. Any other, or different, interpretation as suggested by respondents must necessarily be based upon the assumption that the Assessors neglected their duty by assessing some parcels in a tax district at a given percentage of full value and *772 other parcels at some other percentage, thereby resulting in unlawful discrimination between taxpayers. In the absence of evidence to the contrary, the courts should not indulge in any such assumption, the presumption being that Assessors as public officers have correctly performed their duties.
Inasmuch as the amounts of the assessments as made are not in dispute, it follows that by applying the stipulated percentage of full value at which all property, including that of the petitioner in each town was assessed, to the assessment made, the result must necessarily represent the full value as found by the assessors in each town for each year.
The following is a tabulated summary showing the results •of the above-mentioned mathematical computations:
1958 1959
1958-59 1958% Full Value 1959 Full Value
Assessments Stipulated as found Stipulated as found
as made Rate by Assessors Rate by Assessors
Corning.......... $588,000 100% $588,000
Erwin........... 129,171 32% $403,659 34 379)915
Campbell........ 241,500 28 862,500 29 832,758
Avoca........... 319,144 41 778,400 41 778,400
Wayland......... 319,000 28 1,139,285 28 1,139,285
Sparta........... 550,000 50 1,100,000 50 1,100,000
The Assessors offered no evidence and do not question that presented by the petitioner. I, therefore, conclude and find that the respondent Assessors found the full value of petitioner’s real property in each of the municipalities to be as above indicated. At this juncture it should be noted that the term ‘ ‘ full value ’ ’ means actual or fair market value. It is a cardinal rule that whatever property is worth for the purposes of income and sale, it is also worth for purposes of taxation. (Adams Express Co. v. Ohio, 166 U. S. 171, 220.)
Thus it appears that the stipulations considered with the rebuttable presumption that a correct valuation was found by the Assessors, limit the issue in each proceeding to petitioner’s main contention, i.e., whether and to what extent the otherwise correctly found full values should be reduced by reason of petitioner’s economic difficulties.
The law relating to the subject is well settled in this State. Our courts have repeatedly held that in valuing railroad property for assessment purposes, even though it be but a part of the entire system, it was proper to take into account the earnings of the company and its earning capacity. (People ex rel. Lehigh Val. Ry. Co. v. Harris, 168 Misc. 685, affd. 257 App. *773 Div. 912, affd. 281 N. Y. 786; People ex rel. New York, Ontario & Western Ry. Co. v. Rosenshein, 274 App. Div. 396.)
In Ms opinion in the Lehigh Val. Ry. Co. case (supra) Judge Edgcomb, as Official Referee, wrote (p. 691): “No intelligent valuation of property constructed and used for commercial purposes, and as an investment — and that is the only reason for building or operating a railroad — can properly be arrived at without considering the income derived from the property. A property which is properly managed, and wMch fails to pay its fixed charges, or to return a fair income to its owners, and which shows no likelihood of so doing in the future, is hardly worth replacing, and in such a case reconstruction costs alone would be an unfair basis of value ’ ’. The rule enunciated in the Lehigh Val. case is fundamentally sound and has been approved many times in the courts of our State. Like any other business or commercial enterprise, a railroad is constructed to produce revenue and to yield profit. If that revenue declines, then its value likewise declines by substantially the same ratio.
In the instant cases the properties assessed in the respondent city and towns consist of railroad tracks, passenger and freight stations, signals, bridges, etc., and the land upon which they are located, said properties being more particularly described in the findings of fact presented herewith. If one were to consider these local properties as being separate and apart from the railroad system as a whole they would, of course, have relatively little value, but being an integral part of the entire system they possess great value and, therefore, any decline in the value of the railroad as a whole necessarily causes its local real property to decline by the same ratio.
The evidence presented reveals in much detail the financial deterioration suffered by petitioner during recent years. Its plight is symptomatic of what has been happening to eastern railroads as a whole. Its revenues have decreased to an amazing extent. Since 1956 it has not had sufficient net income from railroad operations with which to meet tax accruals and fixed charges. For the years 1957, 1958 and 1959 the annual average net revenue from railroad operations was $9,200,000 and its average annual tax accruals and fixed charges were $12,400,000. Petitioner’s loss for the entire period from January 1, 1954 to October 16, 1960, the date of the merger with the Erie Railroad Company, excluding nontransportation income and income tax refunds was $20,937,523, $19,700,000 or 94% of which loss was incurred subsequent to 1956. Taking into account nontransportation income and income tax refunds the deficit was $5,524,786 during the same period. In other words, it was able to meet *774 during that period only 38% of its average annual fixed and contingent charges. The railroad last paid a dividend in 1956. In 1957 the rate of return on investments was less than 3/10ths of 1%, and there was no rate of return in 1958, 1959 or 1960. Petitioner suffered a decline in working capital of over $7,000,000 or 70% between 1953 and October 16, 1960, or 70% in seven years’ time. In 1959 the situation became so serious that petitioner was obliged to sell its Nickel Plate Railroad stock in order to pay current bills including its Diesel oil suppliers who were threatening to shut off supplies of Diesel oil unless arrearages were paid within 30 days. Like many other eastern railroads, petitioner’s intercity freight and passenger traffic has seriously declined resulting in proportionate decline in freight and passenger revenue. The market value of petitioner’s stock has decreased from approximately $36,000,000 in 1956 to about $10,000,000 in October, 1960, equal to about a 72% decrease. In this connection the records of other transportation facilities are significant. In 1951 the railroads handled 56% of intercity freight traffic in the United States whereas in 1959 they handled only 46%. During the same years passenger traffic dropped from 45% to only 29%.
Various attempts by the railroad’s management to reduce expense have failed to accomplish any appreciable savings. The average number of employees has been reduced from 9,930 in 1954 to 6,582 in 1960, a reduction of 34%. The monthly average payroll in 1954 Avas $3,727,000 and in 1960 $3,656,000; in other words, the payroll cost decreased only 1.8% Avhile the number of employees decreased 34%. Certain savings have been made in other respects including the installation of mechanical maintenance of right of way, reduction in track miles — 75 miles between Binghampton and Gibson; co-ordination of its passenger facilities and ferry service at Hoboken as well as other facilities with the Erie Railroad Company; reduction of 10% in the salaries of supervisory and executive personnel and other substantial economies.
The over-all picture sIioaaas this railroad to be moving perilously close to bankruptcy. The continual large deficits of the last few years are sufficient to Avarrant the conclusion that no substantial relief is in sight. The Assessors should have taken into consideration and given due weight to the petitioner’s earning capacity and the income derived from the system as a whole. It is apparent that they did not do so, although petitioner in the protest of its assessments called attention to its economic distress and its rapidly diminishing income. Respondents’ failure to give proper, or any consideration, to this *775 important element of value leads to the conclusion that petitioner’s assessments in each of the respondent municipalities is excessive and erroneous and must, therefore, be corrected and reduced. But to what extent and to how much? The assessment of property is not an exact science, and neither is there any mathematical formula that can be entirely perfect for arriving at value. There is a presumption that Assessors, as public officers, have correctly performed their duties, and the burden rests upon the petitioner to show that the assessments are erroneous. But the presumption is by no means conclusive and may be rebutted by evidence which may be much or little. In fact, when the opponent (petitioner) offers evidence to the contrary the presumption entirely disappears. (People ex rel. Wallington Apts. v. Miller, 288 N. Y. 32.) Here the undisputed evidence produced by the petitioner is more than ample to rebut any presumption relating to the issue involved.
The petitioner is asking in each of these proceedings for a reduction of 50% in its assessments because of the economic depreciation of its properties. In my opinion, such a drastic reduction is not justified.
Petitioner also urges that the mathematical formula approved in People ex rel. New York, Ontario & Western Ry. Co. v. Rosenshein (274 App. Div. 396, supra) should be applied here. In that case the Referee attempted to express the economic depreciation by averaging the net income for seven years — $800,000. Since a net income of approximately $2,220,000 was necessary to meet tax accruals and fixed charges, he reasoned that the fraction of 8/22 represented the economic depreciation rate to be applied to reconstruction costs to arrive at actual worth of the property. By using that particular formula here and applying it to comparable figures — $8,000,000 representing the average net income for the years 1958 and 1959, and $12,-000,000 representing net revenue necessary to meet tax accruals and fixed charges — the fraction 8/12 or 66% would be applied to the full value as found by the Assessors to arrive at the actual or full value of the property. Although this formula, if applied in the instant cases, would produce a more reasonable result than the petitioner’s suggested 50% reduction; e.g. the Town of Erwin assessment under the formula would be reduced from $129,171 to $85,252, it is my opinion the formula should not be adopted under the facts as here revealed. In the New York, Ontario & Western Ry. Co. case the court was reviewing the assessments of a bankrupt railroad which had been in the hands of a court-appointed trustee for over 10 years. Bad as is the plight of petitioner, it has not yet reached the point of *776 bankruptcy. As I see it, the proposed 66% economic depreciation rate would result in an unreasonable reduction of the assessments involved.
Under the circumstances here revealed it would seem proper that differential treatment should be given in considering the assessments for the two years in question. When the assessments were made in June, 1958 the much larger deficits occurring later in that year and the years following were not then available and, consequently, the depreciation of petitioner’s properties did not exist to the same extent. The later losses in subsequent years justified greater reductions in evaluations and assessments for the year 1959. However, in considering the extent of petitioner’s economic condition it was proper for the court to receive not only evidence of losses prior to the date of assessments but also losses occurring in subsequent years. (People ex rel. New York, Ontario & Western Ry. Co. v. Rosenshem, 300 N. Y. 74, 79.)
After a careful study and consideration of all the testimony, the stipulations and the various exhibits, I have reached the conclusion that the full and fair value of petitioner’s properties in the various municipalities, and the equalized value thereof at the respective rates as stipulated to which the assessments must be reduced, are as follows:

Petitioner should be entitled to a final order reducing its assessments in accord with the conclusions above stated.
I also present herewith my findings of fact and conclusions of law in each of the 11 above-entitled proceedings, together with the exhibits, stipulations and the evidence taken before me as directed by the orders of reference.