William F. McNulty, Ref.
This is a proceeding, pursuant to section 46 of the Tax Law, to review a final determination of the State Board of Equalization and Assessment (hereinafter designated as State Board), made on May 17, 1952, fixing and determining the full and the equalized valuation of the special franchise of the petitioner, Staten Island Edison Corporation (hereinafter designated relator*), in the borough of Richmond, city and State of New York, for the tax year beginning July 1, 1952, and ending June 30, 1953. The State Board determined that said special franchise had a full valuation of $3,964,900 on the taxable status date, which it thereafter equalized at the rate of 96% to produce an equalized valuation of $3,806,304.
The petition herein challenges the legality of such determination on the grounds of overvaluation and inequality.
By an order made and entered in the office of the Clerk of Albany County on January 9, 1953, I was designated Referee to take the evidence and to hear, try and determine all questions presented by the petition. By a further order made and entered on February 9, 1953, the intervenor-respondent, the City of New York (hereinafter designated as city), was allowed to intervene in the proceeding.
The parties having stipulated that the Referee’s oath be waived, I thereafter entered upon the performance of my duties as Referee as aforesaid. Hearings, at which all the parties were represented by their respective attorneys and counsel and offered their respective proofs, were held in the County of New York beginning on April 23, 1953, and ending on June 13, 1955. At the conclusion of said hearings briefs were submitted, which have been carefully considered along with all the evidence in the case in arriving at this decision.
The State Board is a temporary commission of the State of New York, created by chapter 346 of the Laws of 1949 (and thereafter continued in existence by chapter 293 of Laws of 1952 and chapter 150 of Laws of 1954) to discharge the functions of the State Tax Commission under former section 45 of the Tax Law, which it is undisputed is applicable to this proceeding.
Former section 45 of the Tax Law (L. 1951, ch. 793), which was superseded by the present section of the Tax Law bearing the same number, as of September 1, 1953, provided as follows:
‘ The tax commission shall annually fix and determine the full
*1036 The term “ special franchise ” is defined by subdivision 6 of section 2 of the Tax Law, the pertinent portions of which read as follows: “ 6. The terms land, ’ ‘ real estate, ’ and ‘ real property,’ * * * include the land itself * * * all buildings and other articles and structures, substructures and superstructures * * * all mains, pipes and tanks laid or placed in, upon, above or under any public or private street or place for conducting steam, heat, water, oil, electricity or any property, substance or product capable of transportation or conveyance therein * * * including the value of all franchises, rights, authority or permission to construct, maintain or operate, in, under, above, upon, or through, any streets, highways or public places, any mains, pipes, tanks, conduits or wires, with their appurtenances, for conducting water, steam, heat, light, power, gas, oil or other substance, or electricity for telegraphic, telephonic or other purposes * * . Á franchise, right, authority or permission specified in this subdivision shall for the purpose of taxation be known as a ‘ special franchise.’ A special franchise shall be deemed to include the value of the tangible property of a person, copartnership, association or corporation situated in, upon, under or above any street, highway, public place or public waters in connection with the special franchise. The tangible property so included shall be taxed as a part of the special franchise.”
At the beginning of the tax year involved herein and for many years prior thereto relator was a public utility corporation, organized and existing under the laws of the State of New York and maintaining its principal place of business in the borough of Richmond, city and State of New York. It was engaged in the manufacture, distribution and sale of electric energy to public and private consumers in the borough of Richmond. Its plant and all of its facilities, including the special franchise involved herein, were located entirely in said borough. Prior to April 4, 1950, all of relator’s 325,000 shares of common stock were owned by General Public Utilities Corporation. On this latter date, however, all of said common stock, was sold to Consolidated Edison Company of New York, Inc., *1037 and the two companies were thereafter merged as of December 31, 1952.
Like other public utilities of its kind doing business in the State of New York, relator was subject to the supervision and regulation of the Public Service Commission of the State of New York. The commission, besides regulating relator’s rates and various other aspects of its business, required it to keep its books and accounts in accordance with the uniform system of accounts prescribed by the commission on May 25, 1937, for Class A and Class B electric corporations doing business in the State of New York. The commission also required relator to keep and maintain a continuing property record of the various classifications of property comprising its utility plant, showing the original cost of the property in each classification and the depreciation thereafter periodically accrued against the same. The tangible special franchise property involved in this proceeding, which will hereinafter be referred to as the “ tangible component” of the special franchise, falls within the classifications of the uniform system of accounts above referred to numbered 103, 354 through 359 and 363. Said property is generally described in the statement entitled “ Book Value of Real Property in Streets, Highways and Public Places and Public Waters as of December 31, 1951 ”.
On or about December 29, 1949, the Public Service Commission, after extensive hearings and analysis of relator’s books and properties in a proceeding involving rates then pending before said regulatory body, ordered relator to make certain entries in its books as of January 1, 1949, including entries increasing the accrued depreciation against the various classifications of property comprising its utility plant. It further directed that future depreciation against such classifications of property be accrued at specific rates then approved by the commission.
The original cost of relator’s entire electric plant in service as of December 31, 1948, was $19,675,082.14. Following the making of the aforesaid adjustments, said original cost showed a total accrued depreciation of $4,900,213, thus reflecting a total net book value of $14,774,869 for the entire plant as of said date. Relator’s Exhibit 2 is a carry-forward of relator’s Exhibit 7, on the basis of the depreciation rates approved by the Public Service Commission, from December 31, 1948, to December 31, 1951. It was stipulated at the trial that the book value shown on this latter date was to be deemed “ as prevailing on January 25, 1952, the taxable status date ” herein.
*1038 According to relator’s Exhibit 2, relator’s entire electric plant in service on December 31, 1951, had a total net book value of $16,531,544.78 as of said date, of which a rounded figure of $3,245,600 represented the net book value of the tangible component of the special franchise involved herein. Relator arrived at this latter figure by taking the total original cost of the various classifications of property comprising the tangible component of the franchise, to wit, $4,438,738.80, and reducing the cost of each classification by the accrued percentage of depreciation (which averaged 26.88%) based upon the rates approved by the Public Service Commission in 1949. No value over and above that ascribed to the tangible property located in the public places pursuant to the franchise was ascribed to the franchise right itself.
The formula used by the State Board in making the determination now under review was a simple one. The board took the original cost of the tangible component of the special franchise as shown on relator’s books ($4,438,738.80) and added thereto an item of $3,778 for “ contributed property ” not included in this figure. It then applied to the original cost figure of $4,442,516.80 an 85% “ condition factor ”, which was the equivalent of allowing an accrued depreciation of 15% against such original cost. To the present value of $3,776,139 thus established for the tangible component the board then added an amount equal to 5% thereof ($188,803) to cover the “ intangible value ” of the franchise right itself. The resulting rounded figure of $3,964,900, representing the State Board’s appraisal of the full value of the special franchise as of December 31, 1951, was then equalized at the rate of 96% to produce the equalized valuation of $3,806,304 presently under review.
Relator finds no fault with the depreciated original cost formula used by the State Board in making the above determination. On the contrary, it fully subscribes to the use of this method of valuation, and contends that such method, if properly applied, would have produced a fair and equitable result thoroughly consistent with its earnings during the year 1951 and the purchase price paid for its common stock in 1950.
On the application of this formula, relator’s complaint centers solely around (1) the 15% depreciation allowed by the State Board, which it claims was wholly inadequate, and (2) the 5% thereafter added to the value of the tangible component to cover the “intangible value” of the franchise right itself. Relator contends that, on the basis of its earnings during the year 1951, no value should have been ascribed to the franchise right itself over and above the value which said right imparted *1039 to the tangible property located in the public places pursuant thereto.
As respects the claim of inequality, relator contends that the 96% equalization rate applied by the State Board was far in excess of the actual equalization rate for the borough of Richmond for the tax year 1952/1953, and that the special franchise therefore has been assessed at a much higher valuation than other real property in the borough of Richmond for said tax year. In the verified complaint which it served on the State Board on or about March 31, 1952, shortly after it was notified of the tentative assessment herein, relator alleged that the equalized value of the special franchise ‘ should not exceed 85% of the valuation of said special franchise unequalized ”. In its verified petition in this proceeding relator alleged that the correct equalization rate “ should not exceed 65% ”. At the hearings, however, the relator offered evidence calculated to establish an equalization rate of approximately 59%.

The Claim of Overvaluation

At the trial relator contended that, in determining the present value of the tangible component of the special franchise on the taxable status date, the State Board should have allowed the average accrued depreciation of 26.88% shown on its books. As already noted, this percentage was based on the depreciation rates approved by the Public Service Commission in 1949. The allowance of this percentage of depreciation would have resulted in a round figure valuation of $3,245,600 for the tangible component of the franchise, which was the equivalent of the book value thereof as of December 31, 1951.
The State Board and the city, on the other hand, ignored completely the depreciated original cost formula used by the board in making the determination of value now under review. Instead, they relied entirely upon a formula of depreciated reproduction cost to justify the valuation placed on the tangible component, contending that under this formula the net result — even conceding relator’s claim as to the applicable percentage of accrued depreciation — would have exceeded the valuation presently challenged by a figure in excess of $2,500,000. The proof of depreciation offered by relator therefore furnishes the sole guide for the determination of the issue of depreciation.
The principal witness for relator as respects this issue of depreciation was Mr. Bernard S. Rodey, as assistant secretary of Consolidated Edison Company and the manager of its^ tax department, whose stated qualifications were that he is a licensed engineer and accountant with many years of experience *1040 in the utility field, that he was formerly the chairman of the accounting division and later the vice-chairman of the depreciation committee of the Edison Electrical Institute, and is one of the coauthors of the text entitled “ Public Utility Accounting ” by Foster and Rodey. This witness testified that the 15% depreciation allowed by the State Board was “ clearly inadequate ” and was “inadequate for that purpose ”. To support the general reasonableness of relator’s “book” depreciation, he testified that during the tax year 1952/1953 the State Board allowed a 25% depreciation on similar properties of the following New York electric utility corporations operating under substantially the same conditions as relator: Niagara Mohawk Power Corporation, Rochester Gas and Electric Corporation, New York State Electric and Gas Corporation, Central Hudson Gas and Electric Corporation, Long Island Lighting Company and Rockland Light and Power Company.
Mr. Rodey stated that, in Ms opinion, the maximum value of the tangible component of the special francMse as of December 31, 1951, was “ the same as the book value of such property ”, which was the original cost of such property depreciated by 26.88%. The witness answered in the negative a question by counsel as to whether, based on his experience and knowledge of the public utility industry, this percentage of accrued depreciation was “inordinately large”.
Mr. Edlund, a former vice-president of relator and now the assistant secretary of Consolidated Edison Company in charge of its continuing property records, likewise expressed the opinion that the maximum value of the tangible component as of December 31, 1951, was its “ book value, that is, its original cost less depreciation determined as ordered by the Public Service Commission in 1949 ”.
On the question of the adequacy of the 15% depreciation allowed by the State Board, it is perhaps significant that Mr. Nagler, the city’s own tax specialist, testified that the city assesses property of relator “ similar to the property in issue herein, but located on private land instead of on public streets ’ ’, at its original cost “ less 20 per cent depreciation ”. When Mr. Nagler computed the value of the special franchise property on a depreciated reproduction cost basis, he allowed, for the purpose of computation, a depreciation of 27.11%. As hereinafter noted, however, Mr. Nagler undoubtedly used this rate only as a concession, to point up more strongly his contention that the depreciated reproduction cost formula of valuation should have been used.
*1041 On the basis of the foregoing proof and in the absence of any affirmative evidence by the State Board or by the city as respects this issue of depreciation, it is found that the depreciation accrued against the property comprising the tangible component of the special franchise as of December 31, 1951, was approximately 26.88%. Because it claimed a depreciation of only 25% in its franchise tax return, however, relator will be limited to this latter percentage in the present proceeding.
The above finding of depreciation is not based upon any premise that the determinations made by the Public Service Commission in a rate case are binding on the State Board or the courts in a tax valuation proceeding. As the Queens County Special Term stated through Mr. Justice Stoddard in Brooklyn Union Gas Co. v. Chambers (N. Y. L. J., Feb. 19, 1952, p. 686, col. 1): “ The determination of the Public Service Commission is not binding on the respondents. The latter have been directed by statute to perform a certain duty. Merely adopting the commission’s valuations would be neglect of that duty.” (Emphasis supplied.)
This, however, is far from holding that the findings of this State regulatory body are entirely without evidentiary value in a tax valuation proceeding. Like the members of the State Board, the members of the Public Service Commission “ are sworn officers ” of the State of New York and “ as such, in the absence of evidence to the contrary, are presumed to have done their duty ”. (People ex rel. Wallington Apts. v. Miller, 288 N. Y. 31, 33.) Their findings as to the applicable rates of depreciation for the various classification of property comprising the tangible component of relator’s special franchise constitute a vital part of the basis of relator’s earning power, which in turn necessarily has a sharp impact on the value of relator’s property. Any realistic approach to the issue of valuation' herein therefore requires that some recognition be accorded to this practical aspect of the case.
Although the State Board elected to offer no proof at the trial to justify its allowance of an accrued depreciation of only 15% herein, it now attempts to rely on what the Court of Appeals characterized in People ex rel. Wallington Apts. v. Miller (supra, p. 33), as a “ presumption of sorts that assessors’ valuations are not excessive ”. However, as the court took great pains to point out in that same case (p. 33):
‘ ‘ The important qualifying phrase ‘ in absence of evidence to the contrary ’ must not be overlooked. If the opponent does offer evidence to the contrary the presumption disappears.
*1042 “ Such a presumption is not evidence but serves in place of evidence until the opposing party comes forward with his proof, whereat it disappears. It has no weight as evidence and is never to be considered in weighing evidence. In other words, it merely obviates any necessity, on the part of the assessors, of going forward with proof of the correctness of their valuation. So understood, ‘ the presumption of correctness ’ is merely another way of saying that the burden of proof in a proceeding to review an assessment is on the relator-taxpayer. On him that burden has always rested. (People ex rel. Westchester Fire Ins. Co. v. Davenport, 91 N. Y. 574, 582; People ex rel. Burke, Ltd., v. Wells, 184 N. Y. 275, 279.)
“ So when we say that the burden of proof in such cases is on the relator and that there is a presumption that the assessment is correct, we are not saying two things, but saying the same thing twice. Once such a proceeding goes to trial and the relator goes forward with evidence, the presumption has no further effect of any sort in the proceedings.” (Emphasis supplied.)
The case at bar is just such a case. Here the evidence offered by relator was sufficient to rebut the initial presumption of correctness in favor of the State Board’s determination. At this point the presumption disappeared. From then on, the question was one of affirmative proof, unaided by presumption. On the issue of depreciation the sole proof offered was that of relator. The only theories on which this proof can be rejected are either that it was wholly incompetent or that it was unworthy of credence. On the record herein, neither of these conclusions is justified.
Before leaving this phase of the case, there is another point that should be discussed. In support of its contention that relator failed to sustain the burden of showing that the valuation now under review was excessive, the State Board argues that in special franchise tax proceedings depreciation due to obsolescence “ should be taken care of when it actually occurs.” To support this contention the board relies upon the dissenting view expressed by Judge Haight in his separate concurring (but in reality dissenting) opinion in People ex rel. Manhattan Ry. Co. v. Woodbury (203 N. Y. 231, 240) and People ex rel. Central Hudson Gas & Elec. Co. v. State Tax Comm. (218 App. Div. 44, 57) and People ex rel. New York Rys. v. State Bd. of Tax Comrs. (101 Misc. 205).
As we read the majority opinion in People ex rel. Manhattan Ry. Co. v. Woodbury (supra), the reference by the court in that case to “ dividing the values of the various kinds of *1043 tangible property by the number of years of their respective estimated physical lives ” (p. 236) was merely for the purpose of indicating that depreciation should be computed by the straight line method as distinguished from some other method.
In People ex rel. Central Hudson Gas & Elec. Co. v. State Tax Comm, (supra) and People ex rel. New York Rys. v. State Bd. of Tax Comrs. (supra) the utilities involved had discarded property (in one case two generating units and in the other a power plant) before the expiration of its estimated life. All that the court held in these cases was that an additional allowance should be made during the tax year that the property was retired for the book value which it still possessed under the depreciation rates applied by the relators. In each of these cases the court properly held that this additional allowance for obsolescence could be claimed only during the tax year when the property was prematurely retired.
One of the last expressions by the Court of Appeals on the question raised by the State Board herein, to wit, whether depreciation under the straight line method of computation admittedly used by relator should include future retirement due to obsolescence, as well as to physical causes, is to be found in People ex rel. Third Ave. R. R. Co. v. State Bd. of Tax Comrs. (212 N. Y. 472). In that case the Appellate Division in the First Department squarely held that “ obsolescence shall be duly considered ” in determining straight line depreciation for franchise tax purposes (157 App. Div. 731). In approving ‘‘ the conclusions reached by the Appellate Division in the matter under consideration,” the Court of Appeals made it very plain that the rule which it had previously laid down in the Manhattan Ry. case contemplated that “ the ‘ lives, ’ as there treated, are the periods of time through which the ‘ various kinds of tangible property ’ will respectively * * * continue efficient in and commercially adaptable to their respective processes and functions” (212 N. Y. 472, 484). (Emphasis supplied.) To the same effect: People ex rel. Brooklyn Heights R. R. Co. v. State Bd. of Tax Comrs. (69 Misc. 646, 658-660, affd. 146 App. Div. 372, affd. 204 N. Y. 648) wherein the opinion of Mr. Justice La Boeuf at the Albany County Special Term contains one of the best discussions of this question that is to be found in any of the reported cases, and People ex rel. Pennsylvania Tunnel & Term. Co. v. Miller (26 N. Y. S. 2d 232, 240), decided in 1941, wherein the Queens County Special Term (Steinbrink, J.) said: “ Economic obsolescence is not to be regarded as an element of depreciation *1044 apart from and in addition to physical depreciation. BoiTi factors are necessarily interrelated and combine to produce depreciation ”. (Emphasis supplied.)
The term “ depreciation,” by derivation and common usage, “ includes obsolescence ” (McAnarney v. Newark Fire Ins. Co., 247 N. Y. 176, 185). A public utility which does not have the foresight to anticipate and guard against the contingency that its plant or a substantial portion thereof may become obsolete or inadequate before the expiration of its estimated physical life would not only constitute an investment hazard to its stockholders and bondholders but would hardly be in a position to discharge its duty to the community which it serves. Fortunately, this matter is no longer left entirely to the judgment and integrity of management. One of the primary functions of the Public Service Commission is to see that the reserves of the public utilities under its jurisdiction are at all times adequate to meet contingencies of this type. The uniform system of accounts under which relator operates, for example, requires that the reserve established and maintained by relator to cover plant depreciation shall be sufficient to cover depreciation due to “ inadequacy, obsolescence, changes in art, changes in demand and requirements of public authorities ”, as well as to purely physical causes. As Mr. Justice La Boeuf so well observed back in 1910 in People ex rel. Brooklyn Heights R. R. Co. v. State Bd. of Tax Comrs. (69 Misc. 646, 660, supra), it “ cannot be assumed ” that the State intended that one of its agencies should be allowed to “ create value for the purpose of taxation out of funds which another may say should have been applied to the creation of a fund not subject to that form of taxation.”
If the State Board is correct in its contention that, until it actually occurs, obsolescence may not be considered in determining the depreciation of a public utility’s property for franchise tax purposes, we would have no hesitancy in finding that the 15% depreciation allowed by the State Board in this case was adequate, because it is undisputed that approximately 80% of the depreciation normally charged against the physical plant of an electric corporation is due to “ inadequacy and obsolescence ”, as distinguished from what is sometimes termed “ physical ” depreciation.
After a careful study of the pertinent authorities, however, we are satisfied, and so find, that the depreciation allowed herein should include obsolescence, as well as all other factors which will or may result in the eventual retirement of the tangible component of relator’s special franchise.
*1045 The question of the “ intangible value ” of the franchise right itself, which does not enter into relator’s rate structure, resolves itself into a matter of expert opinion. It is undisputed that it has been the practice of the State Board for many years to attach a value to this incorporeal right equal to 5% of the value of the tangible component of the franchise in all cases where the net return of the utility is less than 6%. Concededly, relator’s earnings for the year in question showed a net return of only 5.86%.
In support of its claim that for the tax year 1952/1953 the franchise right itself possessed no value over and above that ascribed to the tangible component, relator relied upon the testimony of two witnesses, Mr. Rodey and Mr. Edlund. The qualifications of these witnesses have already been noted.
The respondents, to support their claim that, in the absence of a showing of net earnings in excess of 6%, said right possessed a “ nominal ” value equal to 5% of the value of the tangible component, relied on the testimony of Dr. John Bauer and Mr. Salyg Nagler. Dr. Bauer, a consulting economist, testified that his “ main concentration ” for years has been in representing “ cities and consumer groups in preparing rate cases before state commissions ”. Mr. Nagler, a tax expert employed by the city, was formerly the assessor in charge of the city’s bureau of real estate taxes for public utilities and special franchises, but is at present assigned to the public utility tax division of the city’s law department as a tax consultant.
Mr. Edlund expressed the opinion that whatever value the naked franchise right possessed was ‘ ‘ all reflected in the value of the property we have maintained on the streets and upon which we are taxed ” because, without the franchise right, this tangible property “ would have no value,” except as “ junk”.
Mr. Rodey testified that, in his opinion, the State Board’s use of this 5% formula “ where the net earnings rule does not develop any excess earnings, is purely arbitrary and unjustified ”. He further expressed the opinion that the use of this formula to develop an “ intangible value ” where there are no excess earnings “has no basis at all,” and results in “a purely arbitrary determination unsupportable in fact.”
Dr. Bauer was of the opinion that, “as a general formula ” — or, as he later expressed it, “as a public policy basis of valuation ” — the use of a “ figure of 5 per cent, of the tangible value as representing the intangible value of the special franchise is reasonable ”. When asked on direct examination whether the right to locate poles, wires, etc. in the public high *1046 ways ‘ ‘ has some value over and above the value of the property itself ”, he at first testified, “I don’t think I can answer it that way. I think I have to make some qualifications ’ ’. Upon being allowed to qualify his answer, he testified as follows: “ In general, in most instances, the answer is yes. It is particularly yes and specifically yes in valuation for tax purposes. In my opinion there is a sharp distinction between the criteria that determines different kinds of values and particularly for tax purposes. The criteria are the exchange basis and the exchange value, and for tax purposes I think specifically the answer is yes.” The witness then explained that for rate purposes the question of whether the intangible right possesses a value independent of the value ascribed to the tangible property employed in connection therewith “ depends upon the standard of rate value established by the Commission ” and that in most States, including New York, the rate-base “ does not include any additional value for franchise grants, except to the extent that a company may actually have made capital expenditures in acquiring the grant ”, When the witness was asked on cross-examination whether he would ‘ add 5 per cent, to the value of the tangible property to represent the value of the intangible franchise ” herein, if he were asked to determine “ the fair and reasonable value ” of relator’s entire electric plant for the purposes of sale, he replied, “ I would not,” and explained that “ for sale purposes, the purchaser would naturally want to know the rate base on which it would be allowed to earn a return ” and “ that would be the net investment plus working capital ’ ’. Although the witness still adhered to his original view that, for tax purposes, some percentage of the value of the tangible component should be taken to reflect the ‘ intangible value ’ ’ of the franchise right itself, he frankly admitted that, in determining just what this percentage should be, “ There is no specific, precise line of demarcation of what is reasonable or unreasonable ”.
Mr. Nagler testified that, in his opinion, the franchise right possessed an “intangible value” over and above the value ascribed to the tangible component because, “ without this right to operate in the streets, the company could not conduct its business ” and, if it placed its property on private land, “ it would have to pay the owner of the private property for the right ”. In view of the fact that relator earned only 5.86% during the year 1951, however, he would value the intangible right at only “a nominal percentage ” of the value of the tangible component. Although he regarded 5% as “ a nominal percentage,” he admitted that “ it may be more or it may be *1047 less ’ The witness further admitted that, in the final analysis, the value of any property is “ normally related to the ability of the article to be valued to produce income to be used by the company in business for profit ”.
A careful consideration of these sharply conflicting expert opinions and the reasons urged in support thereof compels us to conclude that where, as here, a regulated utility earns less than the reasonable rate of return allowed by the Public Service Commission, whatever value its naked special franchise right may possess is necessarily merged into and becomes an integral part of the value ascribed to the tangible component of the franchise. In reaching this conclusion, two factors have been deemed to be particularly controlling.
The first of these factors is that the tangible component of the franchise derives the major portion of its taxable value from the circumstance of its intimate association with the franchise right itself. Without this right, the tangible component would have comparatively little taxable value.
As the Court of Appeals, speaking through Judge Vastn, in the leading case of People ex rel. Metropolitan St. Ry. Co. v. State Bd. of Tax Comrs. (174 N. Y. 417, 441) so well stated the proposition: ‘ All the mains and pipes, poles and wires, rails and ties of relators, when separated from their special franchises, have no value except as firewood or old iron. Their only substantial value is the right to use them in connection with the franchise, and, hence, they are incidental to the franchise. As part of the franchise they are worth something, but severed from it nothing to speak of. * * * They are worth virtually nothing except for railroad purposes and a railroad cannot occupy a street without a special franchise. Separate them from the franchise by taking away the street privilege, and they are destroyed. Their only value as rails and ties, as distinguished from so much old wood and iron, is gone. Taking the broad and practical view of the subject, which the legislature had the right to take in creating the new system, they have no assessable value worthy of notice, except through the actual and constant use made of them as incidental to the special franchises.”
Because of this, it was held in People ex rel. Jamaica Water Supply Co. v. State Bd. of Tax Comrs. (196 N. Y. 39, 55) that, while ‘ ‘ the legislature has not prescribed any exclusive or hard and fast rule for assessing the value of special franchises,” in most cases ‘ the adoption and application of the net earnings rule would result in a fair and just valuation.” In determining the net earnings attributable to the franchise right *1048 itself, however, the court was careful to point out that, after operating expenses have been deducted from the gross earnings, a further deduction must be made therefrom to cover “ a fair and reasonable return on that portion of the capital of the corporation which is invested in tangible property” (p. 56), which, of course, includes special franchise property. In effect, this is the same as saying that the measure of the value of the franchise right itself is excess earnings capitalized at a fair rate of return .
If an independent value is to be placed on the franchise right in a case where there are no excess earnings, double taxation is bound to result.
Under these circumstances, there is seemingly no justification, legally or economically, for imputing an independent value to the franchise right itself in a case where, as here, the net earnings of the utility do not exceed a fair and reasonable return, or 6%. That the State Board itself recognizes the significance of this 6% dividing line is clear from the circumstance that it applies the 5% formula only where the net earnings of the utility are not in excess of 6%. Where they exceed this fair rate of return, it assumes that the excess earnings are attributable to the franchise right itself and therefor capitalizes such excess earnings at 7% in order to determine the value of the intangible right.
The second factor that has been deemed controlling is that there appears to be no logical basis for the use of the 5% formula employed by the State Board in cases where the net earnings of the utility are not in excess of 6%. Even Mr. Nagler, the principal witness for the State Board and the city, characterized this 5% as a “ nominal ” percentage that “ may be more or it may be less ”. Dr. Bauer, the other witness of the State Board and the city, also admitted that this percentage could vary and, when he was asked if it could be as high as 15%, he could only say that “ that sounds pretty high ”. When he was finally asked how he would determine .what was reasonable, he testified that “ there is no specific, precise line of demarcation of what is reasonable or unreasonable ”. On this premise one could with equal propriety use almost any percentage ranging from 1% to something just short of 15%.
Section 2 of article XVI, of the Constitution of the State of New York specifically provides that “ Assessments shall in no case exceed full value.” In the light of this constitutional mandate, it is a matter of no consequence that the State Board has for many years employed this 5% formula in order to develop taxable value for the franchise right itself in cases *1049 where the net earnings of the utility do not exceed 6%. No administrative practice by an agency of the State, no matter how well established it may be, can impart “ actual ” value to property where such value cannot be in fact demonstrated to exist. As the Court of Appeals, speaking through Judge Willard Bartlett, said in People ex rel. Buffalo Gas Co. v. State Bd. of Tax Comrs. (199 N. Y. 162, 166-167) which was also a special franchise case: ‘ ‘ The elements that enter into its value may be so numerous and variable that it is utterly impossible for the taxpayer or the court to ascertain whether it has been assessed fairly and justly unless some ground of valuation is set forth more enlightening than a bare declaration that the assessing officers exercised their best judgment. As applied to a special franchise this is tantamount to a refusal to state any ground at all.”
Even though it be assumed arguendo that the franchise right herein may possess some slight or purely “ nominal ” value over and above the taxable value ascribed to its tangible component, it is still difficult to convince one who still believes in the value of money that 5% of a figure in excess of $3,000,000 represents only a “ nominal ” valuation; nor can any other percentage figure simply be picked out of the thin air in a case where every deviation of a single percentage point is calculated to make a difference of over $30,000 in tax value. Many tax assessment cases have been litigated where the total valuation at stake was less than this latter amount.
In applying the 5% formula herein, the State Board appears to have proceeded upon the assumption that every special franchise right must of necessity have some value distinct and separate from the taxable value of its tangible component. This view finds little support in the reported cases. In People ex rel. Hudson & Manhattan R. R. Co. v. State Bd. of Tax Comrs. (203 N. Y. 119, 125) the Court of Appeals plainly recognized that it is “ entirely possible that in some cases the intangible right may be of no value ”. This view is also implicit in the holding in People ex rel. Jamaica Water Supply Co. v. State Bd. of Tax Comrs. (196 N. Y. 39) and the other cases which have applied the net earnings rule in measuring the value thereof. In People ex rel. Brooklyn Heights R. R. Co. v. State Bd. of Tax Comrs. (146 App. Div. 372, 373, affd. 204 N. Y. 648) the Appellate Division in the Third Department, in affirming a special franchise tax valuation based on net earnings, pointedly stated: “ The object of an assessment is not necessarily to produce a tax upon the intangible rights but is to determine what the special franchise is worth, and, if the *1050 basis of computation is right, it is quite immaterial for the purpose of fairness whether a tax on the intangible part of the franchise results or not. If there is no value, there is no tax. The assessing hoard and the courts cannot torture facts and conditions to produce a tax — the tax follows a fair and just valuation.” (Emphasis supplied.)
The unreported decision in People ex rel. New York Tel. Co. v. State Tax Comm. (Sup. Ct., Albany County [1953]), cited as authority in support of the practice of the State Board in using the 5% formula in cases where no excess earnings are shown, also proceeds upon the assumption that an independent value (even though it may be only a purely arbitrary one) must of necessity be ascribed to the franchise right itself because subdivision 6 of section 2 of the Tax Law ‘ ‘ indicates the separability for tax purposes of the value of the physical property and the value of the grant from the State.” In our opinion, this “ separability ” of the two basic components of the special franchise does not necessarily require that, after the tangible component has been valued in the light of the substantial value imparted to it by virtue of its intimate association with the franchise right, an independent value must still be ascribed to the franchise right itself even though in point of fact none can be demonstrated to have existed.
Having thus disposed of the two issues raised by relator’s claim of over valuation, the only question that remains to be determined in connection with this claim is whether the depreciated original cost method of valuation admittedly used by the State Board in this case was one that was calculated to produce a fair and equitable result. If this method of valuing the tangible component of the special franchise be adopted, under the previous findings that a 25% depreciation should have been allowed as against the original cost of the property and that no independent or ‘ intangible value ’ ’ should have been ascribed to the franchise right itself, the full valuation of relator’s special franchise for the tax year 1952/1953 would be $3,331,887. In making this computation, we have not only taken the original cost of the tangible component as shown on relator’s books, to wit, $4,438,738.80 but, like the State Board, have added thereto the item of $3,778 representing “ contributed property ”. This “ contributed property ” is just as much a part of the tangible component for tax purposes as property acquired by purchase.
As previously noted, relator fully subscribes to the depreciated original cost method of valuation used by the State Board in making its determination herein in May, 1952. In *1051 fact, it does more than merely approve of this method of valuation. At the trial it test-checked the valuation which would have been produced by the use of this formula, provided that an adequate allowance had been made for depreciation and no independent value had been ascribed to the franchise right itself, against the value of the special franchise computed on a “ net earnings ” basis, and demonstrated that the valuation produced by the proper application of the depreciated original cost method was slightly higher than that developed on a “ net earnings ” basis.
It is undisputed that the total net earnings of relator during the year 1951 were $995,686. Relator urges that the portion of said total net earnings attributable to the tangible component of the franchise (the franchise right itself is accorded no value for rate purposes) is $190,176. This figure represents 19.1% of the total net earnings — the same percentage that the $3,245,000 book value of the tangible component bears to the total book value of relator’s entire electric plant. Said allocation of earnings is based on the theory, recognized by the Public Service Commission, that every investment dollar of relator earns the same as every other investment dollar. Although this theory is criticized by the State Board and the city, we believe that it is one that may properly be invoked in the case where, as in the instant proceeding, we are dealing with a utility which operates on a fairly uniform basis and serves a comparatively small community and where, in addition thereto, the property to which the earnings are to be allocated has a book value of approximately 19.1% of the total book value of the entire plant of the utility. In such a case the practical difficulties of attempting to allocate a portion of the total earnings of a large and intricate interstate railroad to a very small segment of the property of the railroad located in a sparsely settled rural community (People ex rel. Delaware, Lackawana & Western R. R. Co. v. Clapp, 152 N. Y. 490; People ex rel. New York, Ohio & Western Ry. Co. v. Rosenshein, 300 N. Y. 74) or of attempting to allocate a portion of the earnings of a vast and complex interstate telephone system to the special franchise property of such system located in a single city (People ex rel. New York Tel. Co. v. State Tax Comm., Sup. Ct., Albany County [1953]), or the practical difficulties of allocation encountered in a ease like Brooklyn Union Gas Co. v. Chambers (N. Y. L. J., Feb. 19, 1952, p. 686, col. 1, supra), are clearly not present.
In applying the net earnings rule, relator capitalized the net earnings of $190,176 thus attributable to the tangible component *1052 of the special franchise at 6%, which is the fair rate of return allowed relator by the Public Service Commission and the percentage used by the State Board itself as marking the dividing line between fair and excess earnings in determining the “ intangible value ” of the franchise right, and which also, according to Mr. Rodéy, represented the cost of investment money to public utilities in this area during the year 1951. In this connection it will be observed that Mr. Rodey described in some detail the formula used in detérmining the cost of investment money to utilities and concluded that, on the basis thereof, investment money would have actually cost relator “ from not less than six per cent, to not more than seven per cent.” during this period. It was also established on the cross-examination of Mr. Nagler that the average general yield of electric utility common stocks in 1950 and 1951 was in excess of 6%.
The capitalization of relator’s net franchise earnings at 6% produces a valuation of $3,169,000, which is approximately $75,000 less than the book value of the tangible component of the franchise as reported by relator to the State Board. If, instead of the 26.88% depreciation shown on the books of relator, a depreciation of only 25% is allowed as against the original cost of the property, the value of the tangible component on a depreciated original cost basis would be $3,331,887, which is approximately $162,000 higher than the valuation arrived at by relator by the application of the net earnings formula above set forth.
On the basis of the proof adduced at the trial, we are of the opinion that the result achieved by the application of the net earnings formula is some persuasive evidence that the depreciated original cost method of valuation used by the State Board in this case is one which, if properly applied, is calculated to result in a fair and equitable valuation of the special franchise herein.
Relator further urges that, as an additional test-check as to the fairness and reasonableness of applying the depreciated original cost formula in this case, some consideration should also be given to the basic cash price of $10,720,000 which Consolidated Edison Company paid for its common stock on April 4, 1950. In support of its contention that this transaction provides an additional yardstick for measuring the value of the special franchise herein, relator offered into evidence an analysis (prepared by Mr. Rodey) of the acquisition costs and net book value of said common stock as reflected in the balance sheet annexed to the purchase agreement. From this analysis relator sought to demonstrate that the cash price of $10,720,000 *1053 paid for the stock was computed on the basis of the net book value of all of its assets “as of December 31, 1949, adjusted to April 4, 1950 ”. Included in this total book value was the $2,659,270.22 allocated to the tangible component of the special franchise as of December 31, 1949. Relator adjusted this December 31, 1949, figure to the conditions obtaining on December 31, 1951, by (1) adding newly acquired franchise property, (2) eliminating retired franchise property, and (3) deducting the accrued depreciation. The resulting figure naturally coincided with the current book value of the special franchise property. Because of this relator argues that this 1950 common stock sale demonstrates that the book value of the tangible component of the franchise as of December 31, 1951, was in fact its true or actual value as of said date.
In our opinion this proof is entitled to little, if indeed any, probative value as respects the issue of valuation herein. Even though it be assumed, as Mr. Edlund and Mr. Rodey both testified, that this common stock sale was in effect merely the sale of “ a balance sheet ”, the fact still remains that so many other considerations can and often do enter into stock sales of this kind and influence the purchase price paid by the purchaser as to make such a transaction a very dubious yardstick for measuring the true or actual value of any of the specific underlying assets of the corporation whose common stock is being sold. For this reason, no weight has been attached to relator’s proof in this regard in determining the value of the tangible component of the special franchise herein.
Having disposed of the claim of relator that the 15% depreciation allowed by the State Board was wholly inadequate and the further claim that no ‘ ‘ intangible value ’ ’ should have been ascribed to the franchise right itself, we now pass to the claim urged by the State Board and the city at the trial that the true measure of the value of the tangible component of the special franchise herein for tax purposes is its reproduction cost new less depreciation. The only witness called to support this new theory of valuation was Mr. Nagler, the city tax consultant, whose qualifications have already been set forth. Since this method of valuing the tangible component represents a complete and indeed radical departure from the method of valuation employed by the State Board in May, 1952, it is unfortunate that a representative of the State Board was not called as a witness. Although the State Board was not required to produce one of its own representatives as a witness at the trial, it would have been extremely helpful had it elected to do so. In this way we would not only have had the benefit of *1054 knowing what formula the board customarily employs in determining the taxable value of special franchise property and how it arrived at its determination of depreciation herein but also the benefit of the board’s own views as to the effect of State regulation of earnings upon such value.
It is undoubtedly true, as argued by the State Board and the city in their briefs, that in proceedings to review special franchise tax valuations it is the fairness of the ultimate result reached by the State Board which controls rather than the modus opercmdi involved in arriving at such result. In this case, however, the circumstance that at the trial the State Board departed completely from the depreciated original cost formula of valuation which it employed in reaching its determination of value herein, apparently for the purpose of supporting a result not justified by the proper application of that formula, seems to invite some explanation. Since the record is barren of any such explanation, it can only be inferred that there is none.
After enumerating his qualifications as an expert, Mr. Nagler briefly expressed the general opinion that the depreciated original cost formula should not be used as a basis for determining the taxable value of special franchise property. The only reason he assigned for not favoring this method of valuation is that contributed property would thus be eliminated and therefore would escape taxation. Mr. Nagler testified that, in his opinion, the true value of the special franchise herein was $6,538,057. If this valuation is accepted, relator’s special franchise has been undervalued to the extent of over $2,500,000 and the determination now under review must be confirmed.
At the outset it will be observed that the above figure of $6,538,057 was not based upon a reproduction cost study made by competent experts, which obviously would have entailed a considerable expenditure of time and money, but rather upon the average unit installation cost data for the year 1951 (supplied by relator) contained in the stipulation marked respondent’s and intervenor’s Exhibit 1. On the basis of this data Mr. Nagler concluded that, after adding the sum of $85,290 to cover construction work in progress, contributed property and certain other omitted items, the total unit reproduction cost new of the tangible component of the franchise as of the taxable status date would be $8,528,798. To this figure he freely applied a depreciation rate of 27.11% (the total average book depreciation accrued as of Jan. 25, 1952) on the apparent theory that the total value of the special franchise was so far in excess of the valuation found by the State Board on May 17, *1055 1952, that the actual accrued depreciation was a matter of purely academic import. The resultant value for the tangible component was $6,226,298. After adding 5% to this amount to cover the ‘ ‘ intangible value ’ ’ of the franchise right itself under the formula used by the State Board, the ultimate figure of $6,538,057 was reached, which, in the opinion of the witness, represented the true or actual value of the special franchise as of the taxable status date.
For some unapparent reason, Mr. Nagler was not asked on direct examination to explain why he used the depreciated reproduction cost method of valuation. When questioned about this for the first time on cross-examination, he testified that “ ordinarily real property is bought and sold, but utility property is rarely bought and sold, and the purchase price of ordinary property is an indication of value, and, since we don’t have any sale of utility property, we have to resort to the cost to reproduce the property, less existing depreciation of the property to arrive at tax value.” After admitting that depreciated reproduction cost is normally considered the maximum value that can be placed on property for tax purposes, he qualified this opinion by stating that he would use this formula in determining tax value only ‘ if the operation of the entire business ” of the utility “ indicates that the company is operating at a profit after paying all expenses, fixed charges and taxes ”. This, of course, is tantamount to adopting the theory, recognized by the Public Service Commission, that every investment dollar of relator earns the same as every other investment dollar.
When questioned as to the rate of return that he would consider necessary to justify the use of the depreciated reproduction cost formula as a measure of tax value, Mr. Nagler testified that there ‘ ‘ would have to be a certain minimum return on a free and clear basis ” over “ a period of time,” which he at first fixed at 4% of the total investment. Later, however, he indicated that this minimum return of 4% should be based on the depreciated reproduction cost of the total utility plant, plus working capital and materials and supplies, and testified that he “ would not modify the reproduction cost less depreciation for tax purposes unless the return thereon became less than about four per cent ’ ’.
Although Mr. Nagler attached importance to earnings only to the limited extent of determining whether or not this 4% standard was met, he frankly admitted that State regulation of earnings, which, he agreed, is a “ type of price-fixing ”, ‘ ‘ would have a bearing on the value of the entire enterprise ’ ’ *1056 by “ not permitting excessive rates, which would yield excessive income ” and that, if regulation affects the value of the entire property, it would also indirectly affect the value of the various parts therof. Furthermore, he admitted that the city itself assesses private property similar to the tangible franchise property involved herein on a “ cost less depreciation ” basis.
In support of the theory of valuation urged by Mr. Nagler the city argues that “ The property under review is ‘ specialty’ property which is properly valued on the basis of its structural value (i.e., depreciated replacement cost) since it has no ready market value and constitutes property constructed for, peculiarly adapted to and actually used for the special purposes of the petitioner ”. The State Board, however, merely contends that there is “ ample authority for the use of reproduction cost in the valuation of special franchise property ” and that “ the Courts of this State have uniformly held that the reproduction cost of property is a proper basis of valuation for assessment purposes ”.
None of the cases cited by the city support its contention that the special franchise property of a public utility is “specialty” property, nor do we regard such property as falling within this limited category. Basically and essentially, the poles, conduits, etc. involved herein are no different from property of this same general classification located on privately owned land, which Mr. Nagler testified the city itself assesses on a “ cost less depreciation ’ ’ basis.
There is no doubt that, for lack of a better criterion of value, special franchise property and other land improvements have from time to time been assessed on a depreciated reproduction cost basis. However, we can detect in none of the reported cases an intent to “ freeze ” this formula into the law “ as the proper formula for the determination of the value of public utility property ” or other land improvements for tax purposes, or to make such formula the criterion of tax value, regardless of the inequitableness of the result produced or the availability of other and better criteria of tax value.
In People ex rel. Delaware, Lackawanna & Western R. R. Co. v. Clapp (152 N. Y. 490, 494, supra) —cited by the city as “ the leading case in this State on the valuation of public utility property for real estate tax purposes ” — the Court of Appeals took great pains to point out that such property “ may not in every case be worth what it would cost to reproduce it.” The court then went on to say that, in assessing such property, the assessors should consider “ all the elements of value ” and that the result finally reached “may properly be much less, *1057 but can never exceed the actual cost of producing the property in the condition in which it is found by the assessors at the time of making the assessment.” (Emphasis supplied.) Since that time it has consistently been held that, except in the case of “ specialty ” property, depreciated reproduction cost represents the maximum value which may be placed upon land improvements for tax purposes (People ex rel. Manhattan Square Beresford v. Sexton, 284 N. Y. 145, 149; People ex rel. Parklin Operating Corp. v. Miller, 287 N. Y. 126, 130; Matter of Semple School for Girls v. Boyland, 308 N. Y. 382, 388-389).
In People ex rel. Manhattan Square Beresford v. Sexton (supra, p. 149) the Court of Appeals stated: “In assessing an improvement upon real estate for tax purposes the maximum value which ordinarily may be placed upon it is reconstruction cost less depreciation. The value of the improvement arrived at by capitalization of potential or actual income may well be weighed and considered but if it be more than reconstruction cost less depreciation, at least in the absence of extraordinary circumstances not present here, the latter still remains the maximum value which may be assessed upon the property.”
In Brooklyn Union Gas Co. v. Chambers (N. Y. L. J., Feb. 19, 1952, p. 686, col. 1, supra) — one of the eases on which the State Board strongly relies — the Queens County Special Term (Stoddard, J.) stated that “ Citation of authority is unnecessary to sustain the statement that reproduction cost less depreciation is the upper limit for such assessments.” Although the learned Special Term there applied this “ upper limit” of assessment in determining the tax value of a very “ small part of relator’s gas manufacturing and distribution system within the Counties of Kings and Queens,” it left no doubt that it was doing so only because this was the only formula of valuation that was capable of practical application. The court, for example, pointedly stated that “ Were it possible to show the volume of business directly connected with the subject property, and the return which could reasonably be expected or which was actually realized from this part of relator’s business, there would not be the slightest hesitancy in considering such evidence in determining value.”
As already noted, in the case at bar we are not dealing with a very small or minor segment of the entire plant of an extensive utility, but with all of the special franchise property of a comparatively small electric utility which operates on a fairly uniform basis and serves only the smallest (in point of population) borough in the city of New York. Furthermore, on the taxable status date herein this special franchise property *1058 accounted for approximately .19.1% of the book value of relator’s entire electric plant. Under these circumstances an allocation of earnings based on the theory (recognized by the Public Service Comm.) that every investment dollar of relator earns the same as every other investment dollar is adequate to develop a practical yardstick of net earnings value against which the final result reached in this case by the application of the depreciated original cost formula may with some degree of safety be measured. '
The same practical difficulty of allocating earnings which confronted the Special Term in the Brooklyn Union Gas Co. case was present in People ex rel. Delaware, Lackawanna & Western R. R. Co. v. Clapp (152 N. Y. 490, supra); People ex rel. New York, Ohio & Western Ry. Co. v. Rosenshein (300 N. Y. 74, supra) and People ex rel. New York Tel. Co. v. Tax Comm. (Sup. Ct., Albany County [1953]), which are also cited by the city and State Board.
In People ex rel. Delaware, Lackawanna & Western R. R. Co. v. Clapp (supra) seven miles of track comprising an infinitesimally small part of a vast and intricate railroad system were assessed on an alleged net earnings basis, thus producing a valuation in excess of the depreciated reproduction cost of the property. The relator in that case properly contended that the maximum value of the property for tax purposes was its depreciated reproduction cost. In sustaining this contention, the Court of Appeals said that “ There is no reason that we can perceive for assessing this property at a greater sum than the cost of replacement ” (p. 494). In criticizing the “ intricate theory of valuation ’ ’ used by the assessors in order to produce a higher figure, the court observed that “ The principle of assessing a few miles of railroad in a town according to the relations which it is supposed to bear to the whole of a vast and intricate system, or to the income or earning power of the entire system, draws into the calculation so many elements that the process becomes too complex and difficult even for an expert” (p. 495). No such problem is presented in the ease at bar, where we are dealing with all of the special franchise property of a public utility, the rate base of which is predicated on the theory that every investment dollar entering its plant earns the same as every other investment dollar.
In People ex rel. New York, Ohio & Western Ry. Co. v. Rosenshein (300 N. Y. 74, supra) the court was again faced with the problem of determining the value of a very small part of a vast and intricate railroad system, the total income of which was insufficient to meet fixed expenses. Although the depreciated *1059 reproduction formula was employed in determining the basic value of the land improvements, it is clear from the court’s opinion that earnings was the prime factor considered in determining the tax value of the property. Because of the finding that the railroad’s loss of earnings during the tax years involved was “ due to economic factors beyond the control of management” (pp. 78-79), the court held that the Special Term did not act arbitrarily in giving effect to this “ economic depreciation” by reducing “the value employed for assessment by a factor derived from the average annual deficit ” (p. 78). It was accordingly held that the property “ should lie valued for assessment during the years 1936 through 1942 at 8/22, or 36% fa, of land value plus depreciated reproduction cost of improvements ” (p. 79). In thus emphasizing the importance of earnings in determining tax value, the court cited with approval People ex rel. Lehigh Valley R. R. Co. v. Harris (168 Misc. 685, affd. on opinion of Referee Edgecomb, 257 App. Div. 912, affd. 281 N. Y. 786) to which reference will hereinafter be made.
People ex rel. New York Tel. Co. v. Tax Comm, (supra) involved a small part of the total property of a vast and intricate interstate telephone system. For reasons not disclosed by the opinion of the Referee, the State Board valued such property on what might be termed a modified reproduction cost basis, that is, it reduced the reproduction cost figure supplied by relator by 10% and then applied a 20% depreciation factor. The learned Referee held that relator failed to sustain the burden of shoAving that the Actuation thus placed on the property Avas excessive. In passing it Avill be observed that there is nothing in the opinion to indicate AAdiether or not this valuation exceeded the depreciated original cost of the property. As already indicated, the proof of alleged value based upon an attempted allocation of earnings offered by relator in that case Avas rejected on the ground of the practical impossibility of allocating a portion of the total net earnings of a vast interstate telephone system to a small portion of the total property of the utility located in a single geographic area.
Many of the cases cited by the city and State Board in support of the theory of valuation urged by Mr. Nagler arose prior to 1944. In analyzing these cases, there is a further factor Avhich must be kept in mind. Prior to this date there was no inequity in taxing public utility property on a depreciated reproduction cost basis because, under the constitutional concept of “ fair value ” for rate purposes then.prevailing, depreciated reproduction cost played an important part in public *1060 utility rate making (Smyth v. Ames, 169 U. S. 466; Wilcox v. Consolidated Gas Co., 212 U. S. 19; McCardle v. Indianapolis Co., 272 U. S. 400). In Power Comm. v. Hope Gas Co. (320 U. S. 591) decided in 1944, however, the Supreme Court held that there was no constitutional objection to limiting the earnings of public utilities to a fair return on an investment basis (see Matter of New York Tel. Co. v. Public Service Comm., 286 App. Div. 28). Since that time the New York Public Service Commission has considered “ original cost less accrued depreciation ’ ’ as the basic factor in fixing the rates of public utilities.
Obviously, relator would have no objection to having its property taxed on a depreciated reproduction cost basis if it were allowed to earn a fair return on this same basis. While a determination of value by the Public Service Commission for rate purposes is not ‘ ‘ binding ’ ’ on the assessing authorities or the courts in a tax valuation proceeding (People ex rel. Brooklyn Union Gas Co. v. Chambers, supra), it is utterly unrealistic to suppose that the true or actual value of the property of a public utility can be determined on the basis of a formula which, as in the case at bar, produces a valuation upwards of $2,500,000 in excess of that on which this same property is allowed to earn a fair return for its owners. Modern business is not conducted in an economic vacuum where it is completely insulated from those factors which necessarily affect and determine earnings, but in a practical world where values are — and indeed must be — measured by the accepted criteria of the market place.
It has truly been said that “ There is no more important element in the valuation of commercial properties than earnings ” (Ecker v. Western Pacific R. R. Corp.,. 318 U. S. 448, 483). Eliminate earnings as an element in determining the value of commercial property and you destroy the very element which gives such property the enormous tax value which it today possesses. Rate-making is merely ‘ ‘ one species of price-fixing ” and the “ fixing of prices, like other applications of the police power, may reduce the value of the property which is being regulated ” (Power Comm. v. Natural Gas Co., supra, p. 601). In the light of these accepted economic principles, it is difficult to understand how a fair and equitable determination can be made of the value of the special franchise property involved herein through the use of a formula that ignores completely the impact of the State regulation which limits the earnings of relator to a fair return only on the depreciated original cost of its property. This is not the same as blindly holding that the valuation placed on the tangible component *1061 of relator’s special franchise for rate purposes is “ binding ” in the instant proceeding. On the contrary, it is merely giving proper consideration to the practical implications that necessarily flow from the fact that relator is a regulated utility Avhich is permitted by laAV to earn a fair return only on the original cost of its property less depreciation. To ignore these implications would, in our opinion, be to close one’s eyes to one of the most important factors bearing on the issue of Aalue presented in this case.
That the Legislature itself fully appreciates the impact of such regulation upon the value of public utility property is clear from section 5-a of the Condemnation Law, enacted in 1952. This section provides that in any proceeding to condemn the property of a public utility subject to the regulation of the Public Service Commission, the commission, after hearing, shall certify to the court (1) “ the annual earnings Avhich might reasonably be anticipated by the present OAvner thereof pursuant to just and reasonable rates, with due regard among other things to a reasonable average return upon capital actually expended and to the necessity of making reservations out of income for surplus and contingencies ” and (2) “ the rate base and the rate of return from which its estimate of earnings is derived.” In the statement of intent underlying the enactment of this section (L. 1952, ch. 508), the Legislature, after noting that prior awards in proceedings to condemn public utility property had given ‘ inadequate consideration ” to “ the regulated nature of the owner’s property and business and its previous dedication to the public use,” significantly observed that the purpose of the statute was “ to direct the attention of the courts and commissioners of appraisal to the general desirability of the result derived by capitalizing the income which the private company could be expected to earn while subject to regulation as a public utility from rates fixed with due regard among other things to a reasonable average return upon capital actually expended, as last ordered, authorized or otherAvise determined by the public service commission.”
The principles governing the ascertainment of the value of public utility property ‘ ‘ for the purposes of taxation, are the same as those that control in condemnation cases ” (Great Northern Ry. v. Weeks, 297 U. S. 135, 139).
It has long been a “ cardinal rule ” of taxation that “ whatever property is worth for the purposes of income and sale it is also worth for the purposes of taxation.” (Adams Express Co. v. Ohio, 166 U. S. 185, 222; People ex rel. New York Central R. R. Co. v. State Tax Comm., 206 App. Div. 558, 560, affd. 237 *1062 N. Y. 612; People ex rel. Lehigh Valley R. R. Co. v. Harris, 168 Misc. 685, 687, affd. on opinion below 257 App. Div. 912, affd. 281 N. Y. 786, supra.)
In People ex rel. Lehigh Valley R. R. Co. v. Harris (supra, p. 691) the decision below was rendered by Official Referee Ernest I. Edgcomb shortly after his retirement from the Fourth Department bench. There a small segment of the relator’s railroad, located in the town of Ovid, Seneca County, was assessed on a depreciated reproduction cost basis during the depression years, when it was common knowledge that the revenues of all railroads had fallen off to an alarming extent. In substantially reducing said assessments, the learned Official Referee pointed out that “ No intelligent valuation of property constructed and used for commercial purposes, and as an investment— and that is the only reason for building or operating a railroad — can properly be arrived at without considering the income derived from the property.” The court then went on to say: “ The Empire State Building is a valuable property, not only because of the large sum of money expended in its construction, but on account of its location in the business center of New York city, where the demand for stores and offices is great. In arriving at its value for assessment purposes its reconstruction cost would be an important item in determining that amount. But would any one be so bold as to suggest that, if the building were to be taken out of its environment, and placed in the center of the Adirondack Mountains, remote from business activity, and where few, if any, tenants could be found to occupy the offices and stores, and the revenue to be derived from rentals would be practically nothing, the reconstruction cost would be decisive of the value of the building? Would a railroad three hundred miles long, connecting two important industrial centers, and running through a prosperous and thickly inhabited country, be as valuable as one of the same length built in the wilds where but few people resided, and where there was no industrial or business activity? Yet the reconstruction cost of the two roads would be substantially the same. To ask these questions is but to answer them.”
In the final analysis, the question raised by the claim of the city and State Board that depreciated reproduction cost constitutes the true measure of the value of the tangible component of relator’s special franchise really comes down to this: Is the property of a public utility which is allowed to earn a fair return only on a depreciated original cost basis as valuable for the purposes of earnings, sale or taxation as similar property which is allowed to earn a fair return on a depreciated repro *1063 duction cost basis ? To paraphrase the language of the learned Official Referee in the Lehigh Valley R. R. Co. case, “ To ask this question is to answer it.”
At the time it made the determination now under review the State Board itself apparently was of the opinion that the true measure of the value of said tangible component was its original cost less depreciation; otherwise, it is fair to assume that it would not have rejected the “maximum” or “upper limit” formula of valuation urged by Mr. Nagler at the trial in favor of the more realistic depreciated original cost method of valuation which it actually used in making such determination.
No weight can be attached to the argument that “the full impact of petitioner’s real estate tax burden is passed on to the consuming public ’ ’ and that ‘ it may safely be assumed that if petitioner’s tax burden ever effects the rendition of adequate service to the public or an adequate return to its investors, the Legislature will so adjust the special franchise tax that it (will) not interfere with these major purposes of regulation ”. The issue presented by this case is not who would eventually bear the burden of the special franchise tax paid on the property involved herein but what is the true or actual value of said property for tax purposes.
Throughout the foregoing discussion it has been assumed that the “reproduction cost new” figure used by Mr. Nagler in estimating the depreciated reproduction cost of the tangible component as of the taxable status date approximately represents the total cost of replacing all of said property as of such date. Actually, however, there is really no way of determining this in the absence of an expensive and time-consuming reproduction cost study. The so-called reproduction cost new figure used by Mr. Nagler is not based upon any such study but upon the average unit reproduction cost data for the year 1951 (furnished by relator) contained in the stipulation marked respondent’s and intervenoiVs Exhibit 1. The cost of replacing all of the special franchise property of relator during a given year may well be, and undoubtedly is, substantially less than the cost of replacing such property on a piecemeal basis.
In view of the failure of the State Board and the city to offer any convincing proof that some other method of valuation should have been employed, it is found that the State Board was amply justified in valuing the tangible component of relator’s special franchise on a depreciated original cost basis. Whether the use of some other formula might possibly have produced a more accurate picture of the true value of said property is something that cannot be determined on the basis of the proof *1064 adduced at the trial. If an adequate allowance had been made for depreciation and if no ‘ ‘ intangible value ’ ’ had been ascribed to the special franchise right itself, the application of this formula would have produced a result consistent with relator’s status as a regulated public utility and its net earnings during the year 1951, to wit, a valuation of $3,331,887, which it is found was the true or actual value of said special franchise on the taxable status date herein.
As respects the issues raised by relator’s claim of overvaluation, the following is a summary of the ultimate findings made herein:
1. That, on the basis of the proof adduced at the trial, the State Board was justified in valuing the tangible component of relator’s special franchise on the basis of its original cost less depreciation; and such method of valuation is hereby approved and adopted as one which is calculated to produce a fair and equitable valuation of said tangible component for special franchise tax purposes;
2. That, in applying said depreciated original cost formula, the State Board erred, first, in allowing only 15% of the original cost of the tangible component as accrued depreciation and, secondly, in adding 5% to the depreciated original cost of the tangible component to represent the “ intangible value ” of the special franchise right itself;
3. That the total depreciation accrued against the original cost of the tangible component as of the taxable status date was 25%;
4. That, inasmuch as the net earnings of relator during the year 1951 were less than the fair return of 6% allowed by the Public Service Commission, whatever “ intangible value ” the special franchise right itself may have possessed was merged into and became an integral part of the taxable value of the tangible component of the special franchise;
5. That the full valuation of relator’s special franchise as of the taxable status date herein was $3,331,877; and
6. That the full valuation of $3,964,900 placed on said special franchise by the State Board is excessive to the extent that it exceeds said sum of $3,331,887, to wit, to the extent of $633,013.

The Claim of Inequality

The State Board and the city offered no proof as respects this phase of the case. Decision must therefore rest solely on the proof adduced by the relator.
This proof consists of a survey and analysis of some 5,168 sales of new and old properties of various types in the borough *1065 of Richmond made during the years 1950, 1951 and 1952, and a comparison of the computed selling price of each parcel with the assessed valuation thereof. Said survey and analysis was made under the direction and supervision of Mr. Clifford Goes, a licensed real estate broker and tax specialist who has devoted considerable time to the study of equalization rates in the five boroughs of New York and elsewhere in the State of New York. Although most of the field work was done by persons in the employ of Mr. Goes, who were not called as witnesses at the trial, no objection was made to the proof on this ground.
In each case the sales price of the property was determined by interpreting the revenue stamps on the deeds — which it was conceded was evidence of the selling price of the property over and above the amount of the incumbrances assumed by the buyer — and then adding thereto the amount of the incumbrances. In the case of new properties, the computed sales prices were verified by checking the same against the advertised selling prices of the properties, and in many cases by interviews with the buyers.
In the process of making the aforesaid survey and analysis, all transactions which appeared to be “ wash sales, ’ ’ foreclosure, quitclaim or corrective deed transactions, and transfers made at purely nominal values, were excluded. In connection with the 1951 survey, for example, a total of 1,679 transactions were excluded on one or another of these grounds.
The following is a summarization by years of the 5,168 parcels considered, the details of the proof with respect to which are contained in relator’s Exhibits 20 through 25, and 27 through 31:

Total Ratio of

Total Sales Assessment-

No. of Parcels Studied Assessment Price to Sales Price

1950 new properties..... ... 190 $1,148,250 $2,004,200 57.00%
1950 old properties..... .. .1,033 5,818,986 9,438,585 61.65%
Total 1950 properties... ...1,213 $6,967,236 $11,442,785 60.89%
1951 new properties..... ... 98 $663,250 $1,176,800 56.36%
1951 old properties...... ....1,850 10,056,700 16,883,511 59.57%
Total 3951 properties... ...1,948 $10,719,950 $18,060,311 59.36%
3952 new properties..... ... 130 $865,800 $1,644,200 52.66%
3 952 old properties..... .. .1,877 11,389,075 19,210,716 59.29%
Total 1952 properties.. . .. .2,007 $12,254,875 $20,854,916 58.76%
At the trial the city contended that only 1952 sales should be considered in determining the applicable equalization rate. *1066 The State Board was satisfied to have either the 1951 or the 1952 sales considered. Inasmuch as the analysis for each of these years is calculated to establish approximately the same equalization rate, to wit, 59%, it is a matter of little consequence which of these years is actually considered.
Because of the possibility that the point may be raised in the event of an appeal herein, it should be observed that at the beginning of the trial the State Board and the city took the position that, if relator relied solely upon sales to establish the applicable equalization rate, they would move at the conclusion of the trial to strike out all of such proof on the ground that there was a failure to comply with the following portion of section 293 of the Tax Law: ‘ Upon the hearing the parties to the proceeding may mutually agree on parcels of real property to be valued and the number of witnesses to be sworn. But in case the parties fail to agree on a selection of parcels to be valued and the number of witnesses to be sworn, then upon application of either party the court or referee shall determine the number of witnesses to be sworn, select the parcels that shall be valued without reference to their assessed values, and both parties shall be limited in their proof on the trial to such witnesses and the parcels so selected, except that evidence as to actual sales of real property within the tax district that occurred during the year in tvhich the assessment under revietu was made may he given hy either party.” (Emphasis supplied.)
Despite their claim that this portion of section 293 of the Tax Law is applicable to a proceeding to review a special franchise tax valuation under section 293-a of' the Tax Law, and their further claim that the procedure set forth therein is mandatory, no attempt was made by the State Board or the city to invoke said procedure at the trial. On the contrary, the parties stipulated that they would not offer “ any evidence with respect to appraisals in connection with the rate of equalization At the conclusion of the trial no motion was made by either the State Board or the city to strike out relator’s proof of equalization on the ground above stated.
Consequently, even though it be assumed arguendo that the procedure outlined in section 293 is applicable to a proceeding to review a special franchise tax valuation under section 293-a and that such procedure is mandatory, the State Board and the city clearly waived their right to insist that such procedure should have been followed — first, by not invoking the procedure at the trial and, secondly, by stipulating that they would not offer appraisal proof.
*1067 It has recently been held that the parties to a tax assessment review proceeding brought pursuant to section 293 may even waive the requirement of that section that the issues raised be determined by the court rather than by a referee (Matter of Wolf v. Assessors of Town of Hanover, 308 N. Y. 416, 419-420). If they may waive this basic requirement of the statute, there can be no doubt that it is equally competent for them to waive the provisions thereof relative to the mode of proof as respects the issue of equalization. As the Court of Appeals stated in Matter of Wolf v. Assessors of Town of Hanover (supra, pp. 419-420): “In a court which has jurisdiction over the subject matter of the litigation, the parties may agree, within broad limits, as to the mode of trial. Statutory procedures and, indeed, even the constitutionally protected right to a jury trial may be waived by the parties’ acquiescence in the procedure adopted.”
At the conclusion of the trial the State Board and the city did move to strike out relator’s proof as to the applicable equalization rate, but solely on the ground that the same was “ incomplete in that the relator did not consider all the sales which were made in the Borough of Richmond in the years 1951 and 1952, but rather selected only a portion, or approximately one-third of the total sales made in the borough ”. Decision on this motion was reserved.
No exact method of proof has yet been devised for determining the ratio between the actual and the assessed value of real property in a particular community for a particular year. As the Court of Appeals indicated in People ex rel. Hagy v. Lewis (280 N. Y. 184, 188) the law merely requires that the proof offered be adequate for the “ practical attainment of the rough equality which is all that has heretofore been possible under any system of taxation.” With all of its imperfections, the proof of relator meets this general standard of competency. The motion to strike out said proof on the alleged ground of “ incompleteness ” is therefore denied.
It may well be that in making the survey and analysis in question, Mr. Groes and his staff excluded some transactions which should have been considered. It may also be true that, if these transactions had not been excluded, the ratio between the actual and the assessed value of real property in the borough of Richmond for the years 1951 and 1952 would have been higher than the ratio of approximately 59% indicated by relator’s proof. Unfortunately, neither the State Board nor the city (both of which had access at the trial to all of the data obtained during the course of the survey) offered any *1068 evidence that will aid in resolving this question. While computations based upon a limited cross section of sales (1,948 for 1951 and 2,007 for 1952) cannot achieve complete mathematical accuracy, relator has nevertheless satisfactorily established the claim of its petition that the maximum equalization rate herein should have been 65%.
The State Board and the city urge that relator should be estopped from claiming the benefit of an equalization rate of less than 85% in this proceeding, because it alleged in the complaint which it served on the State Board in March, 1952 that the equalized value of the special franchise “ should not exceed 85% of the valuation of the said special franchise before equalization.” When this complaint was served the survey and analysis comprising relator’s proof at the trial had not been made. Under these circumstances, at that time relator can hardly have been expected to have possessed all the data which it later acquired as a result of this study. This being so, the allegation of its complaint that the applicable equalization rate “ should not exceed 85% ” cannot be construed as an admission estopping it from proving a lower equalization rate. (See People ex rel. Long Is. R. R. Co. v. State Bd. of Tax Comrs., 231 N. Y. 221, 226-227.)
A different rule obtains, however, with respect to the minimum equalized valuation which may be applied in this proceeding. In paragraph 9 of the complaint served on the State Board, relator unequivocally alleged that the tentative equalized valuation made by the State Board on March 8, 1952, was “ erroneous by reason of overvaluation and inequality to the extent that the tentative equalized valuation upon the special franchise assessment exceeds the sum of $2,778,735 ”. This was a definite statement that the special franchise had a maximum equalized valuation of $2,778,735 and, under the authorities, relator is now estopped from claiming the benefit of an equalized valuation of less than this specific sum in the present proceeding. (Matter of Wright v. Commissioner of Assessment & Taxation, 242 App. Div. 886, 887, affd. 267 N. Y. 615; People ex rel. Interstate Land Holding Co. v. Purdy, 206 App. Div. 606, affd. 236 N. Y. 609; People ex rel. New York, Ohio & Western Ry. Co. v. Rosenshein, 274 App. Div. 396, 401, revd. on other grounds 300 N. Y. 74, 79, supra.)
On the basis of the findings heretofore made, the determination of the State Board that relator’s special franchise had a full valuation of $3,964,900 and an equalized valuation of $3,806,304, equalized at the rate of 96%, for the tax year beginning July 1, 1952, and ending June 30, 1953, is annulled and *1069 set aside on the grounds of overvaluation and inequality. In lieu of said determination, it is hereby found:
(1) That the full valuation of said special franchise for the tax year beginning July 1, 1952, and ending June 30, 1953, was $3,331,887;
(2) That the applicable equalization rate for said tax year was 65%; but
(3) That, because relator is estopped from claiming the benefit of an equalized valuation of less than $2,778,735, the equalized valuation of the special franchise for said tax year must be deemed to be $2,778,735.
Except as otherwise indicated herein, all motions on which decision was reserved at the trial are denied, with an exception to the party or parties making the same.
The submission of formal findings having been waived by the parties, the foregoing constitutes the decision herein pursuant to section 440 of the Civil Practice Act.
Settle order.

 At the trial the parties themselves referred to petitioner as “ relator ” and all of petitioner’s exhibits are so designated. The designation is being continued to avoid confusion. *1036 and actual valuation of each special franchise subject to assessment in each city, town or village; shall inquire into and ascertain as near as may be the percentage of the full and actual value at which other real property in the city, town or village for which such full valuation has been made, is being assessed, and by the rate of equalization so established fix and determine the equalized valuation of each special franchise subject to assessment.”