Joseph Rosch, Ref.
This reference is somewhat limited in its scope. The order of appointment provides that the proceedings be referred “ to take evidence and to hear, try and determine in accordance with the * * * opinion and order of the Appellate Division, questions as to the State Board of Equalization and Assessment’s determination of the rate of equalization in making the assessment, and to make his .findings and determination herein. ’ ’
This proceeding involves the special franchise assessment for the fiscal year 1952-53, made of the petitioner’s property in the public streets, highways and public places in the Borough of Richmond, City and State of New York.
The proceeding was originally tried before a Referee and decided generally in favor of the petitioner. The Referee’s very full and complete opinion is reported in 6 Misc 2d 1031. An appeal was taken by the respondents and the City of New York, which had intervened, from the order of the Referee reducing the special franchise assessment to the Appellate Division, Third Department. The appeal was decided by the Appellate Division reversing the order on the law and facts, and left for re-examination the issue of equalization. The question presented is indeed a concise one. It is, however, one that presents its difficulty in solution (6 A D 2d 369).
*199 Upon filing its complaint in relation to the tentative valuation and rate of equalization the relator referred to the tentative rate of equalization for the fiscal year July 1, 1952 to June 30, 1953, which was fixed at 96%, and asserted that the same was not on the same basis as the assessment of other real property in the Borough of Richmond. The complaint as to rate of equalization sought was expressed in this language: 11 7. The fair and equalized valuation upon the said special franchise of complainant for the fiscal year July 1, 1952 to June 30, 1953, should not exceed 85% of the valuation of the said special franchise before equalization and elimination of inequality. ’ ’ Furthermore in the complaint filed it was claimed that the equalized value was erroneous in that it “ exceeds the sum of $2,778,735.”
In the petition in this proceeding the relator alleges that ‘ ‘ the rate of equalization applicable to the full valuation of petitioner’s special franchise located in the said municipality should not exceed 65%.” The claim is made of excessiveness by reason of overvaluation, inequality and an incorrect rate of equalization in the sum of $1,687,400, and that the assessment should not have exceeded $2,118,900. The claimed excessive assessment by the petition is $658,835 more than the complaint, and equalization rate claimed by petition 20% lower than in the complaint.
The hearings before this Referee to re-examine the issue of equalization were limited to proof offered in behalf of the respondents and intervenor. The ultimate question to be determined here involves also the consideration of the evidence offered and received in the original hearings. The evidence received in the original hearing in behalf of the relator in regard to the question of equalization was the testimony of the witness Groes and exhibits, which he submitted and which were received in evidence. The opinion of the Appellate Bivision (p. 376) expresses the views of the court in regard to this testimony as follows: ‘1 The Referee himself accepted without apparent reservation and on its face value the testimony of a witness who described himself as a ‘ tax specialist ’ dealing in ‘ over-all assessment structures of various tax districts. ’ This testimony was not only largely grounded on hearsay reports made to the witness by various people working for him, but in our view of his testimony, it was so selective, in both its eliminations and inclusions of types of property within the tax district, as to distort the fair ratio of actual values as a whole to assessed values in the district.”
A study of the exhibits, listing over 2,000 items discloses, from what has been an attempted segregation of all properties with an assessment of over $20,000, a total of 71 properties. They *200 have been considered and studied and reference to them is subsequently made with their assessment and ratios. The overloading of the exhibits with properties of small assessment is what the appellate court may have had in mind when using the word “ selective ” in its opinion. The rate of assessment of small homes has always been given what is generally referred to as low assessments. Some may argne that the rule of full assessment is required, but the answer is a simple one, and that is if the rule of full assessment was followed, there would be no solution by or study of equalization.
If from an examination of the testimony and the somewhat voluminous exhibits there is a lack of agreement as to the above-quoted portion of opinion of Appellate Division it would be expressed. Otherwise it would be impossible to review and determine what might be considered the reasonable equalization rate. Whatever may have been expressed in the opinion of the Appellate Division there still remains in the record evidence submitted by the relator on question of equalization to be considered.
There has been made a careful study of the testimony and exhibits presented in behalf of the relator on the question under consideration and for determination. The properties selected and deeds of which were claimed to have been examined as to consideration based upon value represented by stamps are generally of a comparatively small value. By whom the examinations were made does not appear too clearly. One is lead to believe that most properties appear to have been somewhat modest homes on small lots. From exhibits one cannot tell much about the properties. Government stamps and even consideration expressed do not carry too much weight at times as to sale prices, and certainly less as to value. The witness for relator as to the method pursued had expressed himself previous to testifying in this proceeding as follows: “ Unfortunately some interests persist in stressing current sales as the only basis for determining real property values and equalization rates. This is not true even in a normal market ’ ’. Again he agreed with his previous statement as follows: “Those who would establish equalization rates from sales data also seek to reconcile the two types of valuation by assuming that sales in and of themselves afford a true measure of full value. This is not true. Sales data alone is insufficient for determining ‘ full value ’ and is merely one, not the controlling factor.” Again, “Even a voluminous exhibit of sales data should not be taken as indicative of the true picture ”.
*201 If there was any study, inquiry or investigation made in relation to business properties, apartment houses or property of substantial value, it does not appear. To somewhat paraphrase some of above-quoted statement, it may be said that even a voluminous exhibit of small property sales data “ should not be taken as indicative of the true picture ” in attempting to consider equalization rate applicable to a special franchise assessment of several million dollars. The Borough of Richmond (Staten Island) has been referred to as a small community. Its population is more than 220,000 and although it may have many so-called housing developments, it certainly must have properties of considerable value and reasonably large assessments. It is well understood that the evidence to which reference is being made is before the Referee to be considered, and reference to it will be herafter made.
The respondent board was created under chapter 346 of the Laws of 1949. By section 1, under title ‘ ‘ Legislative determinations ” there is stated the purpose creating the State Board of Equalization and Assessment as a temporary commission. To this board was transferred all of the functions and powers possessed by and all duties of other named boards or commissions and including ‘ ‘ the determination of the full and equalized value of special franchises ”. The duties and functions of the Board of Equalization and Assessment were related to the provisions of the Tax Law.
The hearings before this Referee have been confined to evidence offered in behalf of the respondents. The respondents have referred to the provisions of the law which provides that they shall ascertain the final rate of equalization and equalize the final full value of each special franchise to such an amount as in its judgment will place the special franchise on the same basis as the assessment of other real property in the city, town or village in which the special franchise is located. Section 45-b of the Tax Law is entitled ‘ ‘ Special franchise; determination of fixed valuation ’ ’, and provides as follows: 1 ‘ After hearing complaints as to such valuation of the special franchise, the commission shall fix and determine the final value of each special franchise. In determining the final valuation of a special franchise, the tax commission may, in its discretion, take testimony and hear proof, under oath or otherwise, and may avail itself of all information on the subject appearing of record in its office and all information which it may acquire in the discharge of its duties, and may employ its experts, agents or other persons in procuring any information it may require for such purpose.”
*202 The foregoing is quoted in full and represents what appears to have been the plan and manner of general approach to the determination of equalized rates. Originally the full value was fixed at $3,779,800, and afterward increased to $3,964,000. This appears to have been due to protest of the city intervenor and information furnished by the relator to the board showing there had been added more to property than had been removed through deletions and retirements. Apparently this situation was not stressed or referred to during previous trial or appeal. It does not appear to be a present matter for consideration, because the original assessment of both tangible and intangible property at $3,964,900 is fixed, accepted and determined by the Appellate Division. The pertinent language in opinion of that court is (p. 377): “We accept the valuation of the tangible property as found by the State Board and accept also as a proper component of value the intangible property in the amount found by the board as justified and reasonable. The issue left for re-examination before the Referee is the issue of equalization.”
The respondents’ proof is far from very specific or direct. The language of section 45-a of the Tax Law is undoubtedly broad and there is provided a general plan or scope in which the respondents can carry on their work. There must be accepted the presumption in favor of the assessment and equalization. The testimony shows that the respondents with the responsibilities placed upon them built up and created an organization to undertake and carry out the prescribed duties. The evidence shows that the work of organization and the doing of the work were carried through by the respondents with commendable care, as either a listening to the testimony and going over the evidence would lead one to feel. To the extent as provided by statute the work of equalization and assessment was carried on with thoroughness. The somewhat unfortunate situation here however is that of the proof submitted by the respondents there is little that can be specifically related to the situation presented in regard to equalization rate in Borough of Richmond.
The witnesses relate and explain the steps taken to perfect the organization and its working. The work was State-wide and covered several years, even a number of years subsequent to the assessment of special franchise involved. Respondents produced witnesses who were familiar Avith the organization of the department and one of the respondents testified. Somewhere in about 1954 the original work as planned and pursued was generally carried through to completion. The board was advised that there was not sufficient data from study of 1949 to make new equalization rates and assessments through the State, based *203 upon current market values of 1949. As an alternative the only figures which the board had available to it “ were the figures originally prepared by the State Tax Commission which were mostly based upon cost figures — cost figures as of 1940 — and the equalization rate which had been made by the State Tax Commission.” There was recommended that the board adopt the equalization rate of 96%, which it adopted. Such equalization rate appears to have been used for a number of years prior to the year here in controversy.
In the study by the respondents the preliminary reports showed the old equalization rates were generally too high, and the old special franchise full values were generally too low compared with values on a current basis. Such situation existed at time of the commencement of the study in 1949. The State Board used its new equalization rates established for the Borough of Richmond in 1954. Apparently the new equalization rates went into effect that year quite generally throughout the State. Such rate for Borough of Richmond was 59% and the rate was based upon new market value data. Much time was spent in the examination of witnesses in relation to the 59% equalization rate and attempting to apply it to the value fixed by the assessment in the amount made and accepted by the Appellate Division. This was prompted by what was shown by study in 1949 and 1950. The assessment approved by appellate court was not based upon current prices, but upon that which the respondents refer to as prewar prices. The assessment and equalization rates were generally so changed throughout the State to conform to the increased and inflated prices.
This assessment was made in the interim when the respondents were confronted with one of the most important and wide-reaching undertakings in matter of assessment and equalization in the history of the State. One has but to read the provisions of section 1 of chapter 346 of the Laws of 1949 to understand the scope and extent of the work. (See, also, Real Property Tax Law, § 202.) One of the respondents stated quite clearly and explicitly that the assessed value under review was “ a reflection of 1941 pre-war values and to be equalized required the use of the pre-war equalization rate of 96%. ” Again he said that 59% was on 1952 levels of value. Clearly the board was developing new rates of assessment and incidently and necessarily related thereto a changed equalization rate. Apparently the relator’s tax expert had knowledge of the study and work of the respondents, and stated that the equalization rate that he had conceived as ‘ ‘ right; substantially the same as the state found in independent studies.” Such last statement could have *204 been very well qualified by a reference that the “ independent studies ” were made in relation to a general State-wide undertaking and were based as to Borough of Richmond on an increase of general assessments including any special franchise.
Most of the hearings under this reference were related to the study made by respondents. Clearly during that study there was no change made from equalization rate that had been existent under the State Tax Commission for a number of years. Any specific appraisal or anything that the respondents have presented that can be directly connected with the value and assessment of property in Borough of Richmond is difficult to find. There was an endeavor to allow almost unlimited scope of proof and discussion; and it was suggested a number of times, that the questions and testimony be more related to Staten Island. The respondents are favored to start with a presumption as to the reasonableness of the rate established. That however is not inviolate or conclusive. There is also the period of time that this equalization rate was continued and stood without objection. That feature also has no element of conclusiveness. It does not tend to sustain its correctness, but is certainly a circumstance. Furthermore as heretofore stated these respondents were engaged in an important undertaking, and it was time-consuming and State-wide. It is very clear that what was done in the respondents’ study does not in any way justify a holding that their equalization rate should be reduced as urged by the relator to 59%, or if reduced at all to any such amount. To assert that such a rate should apply to amount of assessment involved when based upon study of general revision and increase of assessments does not carry any conviction.
It would have been much easier to have considered and determined the pending question if there had been selected properties. It should be little concern what statute applies, or in fact if there were no statute. Tax cases cannot be tried by appraisal and testimony in relation to each item on assessment roll; and the selection of properties, where possible, of a compartive type should be made. That practice has been pursued and generally followed for much over a half century.
The list submitted and shown by Exhibits 23, 24, 25, 28 and 30, have been referred to and expressions of views in relation thereto given. The sale price, if correct, and assessment of such a great number in very small amounts are hardly representative of comparative assessments to the one under review. Truly comparable property is difficult to find; but the use of properties of some value would be certainly used in the event of selected lists.
*205 In the'referred to exhibits are listed some properties assessed for over $20,000. Compared with the great number of properties listed there are very few.
On Exhibit 23 (1951) are 20 properties of over $20,000 assessment. The total claimed sale price of these properties was $842,342 and assessed value $694,600, of ratio for total amount of of .8246%. Of these properties the ratio as shown by exhibit are apportioned as follows: Under 50% 2, 50% to 60% 3, 60% to 70% 2, 70% to 80% 1, 80% to 90% 3, 90% to 100% 2, 100% to 184% 7 — 20.
On Exhibit 24 (1951) are 11 properties of over $20,000 assessment. The total claimed sale price of these properties was $323,100 and assessed value $302,700, of ratio for total amount of .94%. Of these properties the ratio as shown by exhibit are apportioned as follows: Under 50% 0, 50% to 60% 1, 60% to 70% 2, 70% to 80% 0, 80% to 90% 2, 90% to 100% 0, 100% to 160% 6 — 11.
Exhibit 25 (1952) refers to 5 properties over $20,000 assessment. The total claimed sale price of these properties was $134,900 and assessed value $109,200, of ratio for total amount of .81%. Of these properties the ratio as shown by exhibit are apportioned as follows: Under 50% 0, 50% to 60% 1, 60% to 70% 0, 70% to 80% 2, 80% to 90% 0, 90% to 100% 0, 100% to 115% 2 —5.
Exhibit 28 (1951) refers to 10 properties of over $20,000 assessment. The total claimed sale price of these properties was $576,947 and assessed value $459,800, of ratio for total amount of .7969%. Of these properties the ratio as shown by exhibit are apportioned as follows: Under 50% 1, 50% to 60% 1, 60% to 70% 1, 70% to 80% 1, 80% to 90% 2, 90% to 100% 2, 100% to 134% 2 — 10.
Exhibit 30 (1952) refers to 25 properties over $20,000 assessment. The total claimed sale price of these properties was $2,874,634 and assessed value $2,197,000, of ratio for total amount of .765%. Of these properties the ratio as shown by exhibit are apportioned as follows: Under 50% 2, 50% to 60% 2, 60% to 70% 4, 70% to 80% 4, 80% to 90% 2, 90% to 100% 3, 100% to 135% 8 — 25.
By such exhibits there are shown 5 properties under 50%; 8 properties 50% to 60% ; 9 properties 60% to 70% ; 8 properties 70% to 80%; 9 properties 80% to 90%; 7 properties 90% to 100% ; 25 properties over 100% —71.
Of the 71 properties in this classification 41 have over 80% ratio and 30 less than 80% ratio. The average ratio (whatever it may mean) would be about .83 minus. The average ratio of *206 the total of $4,751,923 price as to total of $3,763,300 assessment would be .79%.
Notwithstanding the criticism that has been made of the testimony and exhibits, in going through the original record, there seems to be too little to help on the pending question. The reason for going to the above exhibits has been expressed. Exhibits 20, 21 and 22 can give little help. These exhibits claim to list a total of 408 properties. In Exhibit 20 there is not a property assessed as high as $10,000. In Exhibit 21 there is one assessed as high as $10,000. Exhibit 22 shows 7 properties assessed at $10,000 or over, and the highest one $13,000. So out of 408 properties there are 400 properties assessed at less than $10,000. Properties of that value would hardly be selected under statute or in practice to be considered in relation to equalization rate where an assessment of several million dollars is involved.
The relator’s proof referred to is practically the only evidence related specifically to other properties and their assessments. The exhibits submitted cover so many properties that it has been deemed necessary to cull out the properties referred to of some substantial value. The statement in the original complaint filed to the assessment, reference to which has been made, the equalization rate was claimed “ should not exceed 85%.” The amount of assessment is claimed should not exceed $2,778,735, It has heretofore been held in this case that, although with assessment and equalization as found on first trial, would be less than $2,778,735, that the relator could not have assessment reduced beyond the last expressed amount because it was estopped by definite statement, citing a number of cases, which appear to so hold (6 Misc 2d 1031, 1068). As to 85% the statement is just as plain and has to be related to the other statement and certainly is an admission or estoppel, just as well as the stated amount. There is no holding in the decision of People ex rel. Long Is. R. R. Co. v. State Bd. of Tax Comrs. (231 N. Y. 221) where there was a vague, confused and somewhat misleading assessment of a considerable number of grade crossings special franchise assessments covering a number of miles of trackage in different counties and communities, and the court held that the railroad under circumstances did the best that could be expected, and even then said the railroad could have pointed out any crossings if it claimed prior occupancy. If the equalization rate had been fixed in this proceeding at 85% after its complaint, it hardly would have served the relator any useful purpose to review or criticize it.
As to the rate of 96%, outside of the presumption that may exist in its favor, it is impossible to find in the old record or the *207 present hearings any evidence or study in relation to what properties were examined or considered in its establishment or in justification of the same. At most all that can be said the equalization rate which had been previously fixed by the Tax Commission was accepted. There is no proof as to what was done by the Tax Commission in its establishing of the equalization rate. True reference has been made by the respondents to prewar prices but there was added in the year of questioned assessment about $200,000 for betterments in excess of depreciation and deletion. Such additions do not represent any prewar values, and it is fair to assume that other betterments were added since 1941, although proof is lacking in regard thereto. It seems that one is pretty well limited to the proof offered as to sale prices and related assessment. Criticism has been made of such proof but the analysis of the portion that might be considered lead to the belief that the equalization rate should not be as high as contended by respondents, and any figure as low as 59%, 60% or 65% as contended by relator. It should be not less than 85% or more than 90%, and one can from what analysis has been made fix it at 88%, which appears under the circumstances to be a fair and equitable rate. It is impossible to find proof to justify the 96% equalization rate. Study by some may find justification for it or be able to justify it under favored presumption or general inference in favor of sustaining an official act. The question presented is a concise one but presented its difficulty in solution.
The ultimate determination, findings and conclusions herein are briefly as follows:
First. That the respondents’ board fixed the relator’s special franchise involved in this proceeding at full valuation of $3,964,-900, and equalized the same at rate of equalization of 96% for the tax year beginning July 1, 1952 and ending June 30, 1953, and determining the equalized valuation at $3,806,304, and that the original valuation of $3,964,900 has been approved and accepted by the Appellate Division of this court and equalization rate is here for decision and determination.
Second. That the fair and equitable rate of equalization for said tax year herein is 88% and that the said equalization rate of 96% is excessive in amount.
Third. That the full valuation of $3,964,900 as heretofore made should be equalized at 88% thereof and at the amount of $3,489,112.
Fourth. That such full amount of assessment should be reduced by such equalization rate of 88% in amount of $475,788 which is $317,192 more than was originally fixed by respondents *208 at 96% equalization rate and the original equalized assessment should he reduced $317,192 to said amount of $3,489,112.
Fifth. That the assessment he reduced as above.
It has been stipulated that formal findings have been waived by the parties herein and the foregoing constitutes the decision herein pursuant to section 440 of the Civil Practice Act.